T.C. Memo. 1996-454


UNITED STATES TAX COURT


STUART A. AND HARRIET J. GOLLIN, ET AL.,[1] Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket Nos. 16922-90, 19612-90,        Filed October 9, 1996.
             21847-90.


<u>Stuart A. Smith</u> and <u>David H. Schnabel</u>, for petitioners in
docket Nos. 16922-90 and 19612-90.

Charles Fredericks, Jr. and Stephanie Fredericks, pro se in
docket No. 21847-90.

<u>Louise R. Forbes</u>, <u>Mary P. Hamilton</u>, and <u>William T. Hayes</u>,
for respondent in docket No. 16922-90.

<u>Paul Colleran</u> and <u>William T. Hayes</u>, for respondent in docket
No. 19612-90.

---

[1]     Cases of the following petitioners are consolidated for
opinion:  Myron and Patricia Fishbach, docket No. 19612-90; and
Charles Fredericks, Jr. and Stephanie Fredericks, docket No.
21847-90.  These cases were tried and briefed separately.

Gregory S. Nickerson and Frances Ferrito Regan, for

respondent in docket No. 21847-90.

CONTENTS

                                                            Page
MEMORANDUM FINDINGS OF FACT AND OPINION....................... 2
OPINION OF THE SPECIAL TRIAL JUDGE........................... 3
FINDINGS OF FACT............................................ 7
  A. The Plastics Recycling Transactions.................... 7
  B. The Partnerships.....................................10
  C. Stuart Becker and Steven Leicht......................13
  D. Petitioners and Their Introduction to the Partnership
     Transactions........................................17
     1. Stuart and Harriet J. Gollin.......................17
     2. Myron and Patricia Fishbach........................20
     3. Charles Fredericks, Jr. and Stephanie Fredericks......23
OPINION....................................................29
  A. Section 6653(a)--Negligence...........................31
     1.  The So-Called Oil Crisis........................33
     2.  Petitioners' Purported Reliance on Tax
        Advisers.......................................38
          a.  The Circumstances Under Which a
              Taxpayer May Avoid Liability Under
              Section 6653(a)(1) and (2) Because
              of Reasonable Reliance on Competent
              and Fully Informed Professional
              Advice.....................................39
          b.  Becker.....................................41
          c.  Hertan.....................................48
          d.  Steele, Cohen, and Porter...................51
     3.  The Private Offering Memoranda...................54
     4.  Miscellaneous...................................59
     5.  Conclusion as to Negligence......................68
  B. Section 6659--Valuation Overstatement...................69
     1.  The Grounds for Petitioners' Underpayments.........71
     2.  Concession of the Deficiency.....................76
     3.  Section 6659(e)...................................79
  C. Petitioners' Motions For Leave To File Motion For
     Decision Ordering Relief From the Negligence Penalty
     and the Penalty Rate of Interest and To File Supporting
     Memorandum of Law...................................83

MEMORANDUM FINDINGS OF FACT AND OPINION

DAWSON, Judge:  These cases were assigned to Special Trial

Judge Norman H. Wolfe pursuant to the provisions of section

7443A(b)(4) and Rules 180, 181, and 183. They were tried and briefed separately but consolidated for purposes of opinion. All section references are to the Internal Revenue Code in effect for the tax years in issue, unless otherwise indicated. All Rule references are to the Tax Court Rules of Practice and Procedure. The Court agrees with and adopts the opinion of the Special Trial Judge, which is set forth below.

OPINION OF THE SPECIAL TRIAL JUDGE

WOLFE, Special Trial Judge: These cases are part of the Plastics Recycling group of cases. For a detailed discussion of the transactions involved in the Plastics Recycling cases, see Provizer v. Commissioner, T.C. Memo. 1992-177, affd. without published opinion 996 F.2d 1216 (6th Cir. 1993). The facts of the underlying transactions and the Sentinel recyclers in these cases are substantially identical to those in the transaction considered in the Provizer case.

In notices of deficiency, respondent determined the following deficiencies in and additions to petitioners' Federal income taxes:

- 4 -

| | | | | Penalty | Additions to Tax | |
|---|---|---|---|---|---|---|
| Docket No. Sec. 6659 | Petitioner Sec. 6661 | Year | Deficiency | Sec. 6621(c) | Sec. 6653(a)(1) | Sec. 6653(a)(2) |
| 16922-90 | Stuart A. and Harriet J. Gollin | 1979 | [1]$11,888 | [3] | [4]$594 | -- |
| $3,566 | -- | 1980 | [1]2,728 | [3] | [4]136 | -- |
| 818 | -- | 1982 | 9,348 | [3] | 467 | [5] |
| 2,804 | [6]$2,337 | | | | | |
| 19612-90 | Myron and Patricia Fishbach | 1982 | 17,471 | [3] | 873.55 | [5] |
| -- | 2,941.75 | | | | | |
| 21847-90 | Charles Fredericks, Jr. and Stephanie Fredericks | 1982 | [2]128,880 | [3] | 6,444 | [5] |
| 30,752.70 | [6]6,592.75 | | | | | |

[1]The deficiencies in docket No. 16922-90 for taxable years 1979 and 1980 result all or in part from disallowance of investment tax credit carrybacks and business energy credit carrybacks from taxable year 1982.

[2]The deficiency in docket No. 21847-90 arose in part from respondent's disallowance of certain tax benefits flowing from petitioners Fredericks' investment in B & H Shipping Associates V (B & H Shipping). On May 30, 1991, the parties filed a stipulation of settled issues resolving all of the issues related to the investment in B & H Shipping.

[3]Sec. 6621(c) was repealed by sec. 7721(b) of the Omnibus Budget Reconciliation Act of 1989 (OBRA 89), Pub. L. 101-239, 103 Stat. 2106, 2399, effective for tax returns due after Dec. 31, 1989, OBRA 89 sec. 7721(d), 103 Stat. 2400. The repeal does not affect the instant cases. The annual rate of interest under sec. 6621(c) for interest accruing after Dec. 31, 1984, equals 120 percent of the interest payable under sec. 6601 with respect to any substantial underpayment attributable to tax-motivated transactions.

[4]The notice of deficiency in docket No. 16922-90 lists the additions to tax for negligence for taxable years 1979 and 1980 under sec. 6653(a)(1). For taxable years 1979 and 1980, the addition to tax for negligence was provided for under sec. 6653(a).

[5]50 percent of the interest payable with respect to the portion of the underpayment attributable to negligence. Respondent determined that the portion of the underpayment attributable to negligence was $9,348 in docket No. 16922-90, ,767 in docket No. 19612-90, and $128,880 in docket No. 21847-90.

[6]The sec. 6661 determination is in the alternative to the sec. 6659 addition to tax.

On March 2, 1994, respondent filed a first amendment to answer in docket No. 19612-90. Respondent asserted therein a lesser deficiency of $17,445, a lesser addition to tax for negligence under section 6653(a)(1) in the amount of $872, and an addition to tax for valuation overstatement under section 6659 in the amount of $4,132. Respondent also asserted that the interest under sections 6653(a)(2) and 6621(c) was to be computed on $17,445 instead of $11,767. In addition, respondent conceded the addition to tax determined under section 6661.

The parties in these consolidated cases filed Stipulations of Settled Issues concerning the adjustments relating to their participation in the Plastics Recycling Program. In docket Nos. 16922-90 (the Gollins) and 19612-90 (the Fishbachs), the stipulations provide:

> 1. Petitioners are not entitled to any deductions, losses, investment credits, business energy investment credits or any other tax benefits claimed on their tax returns as a result of their participation in the Plastics Recycling Program.
>
> 2. The underpayments in income tax attributable to petitioners' participation in the Plastics Recycling Program are substantial underpayments attributable to tax-motivated transactions, subject to the increased rate of interest established under I.R.C. §6621(c), formerly §6621(d).
>
> 3. This stipulation resolves all issues that relate to the items claimed on petitioners' tax returns resulting from their participation in the Plastics Recycling Program, with the exception of petitioners' potential liability for additions to the tax for valuation overstatements under I.R.C. §6659 and for negligence under the applicable provisions of §6653(a).

4.  With respect to the issue of the addition to the tax under I.R.C. §6659, Petitioners do not intend to contest the value of the Sentinel Recycler or the existence of a valuation overstatement on the Petitioners' returns; however, Petitioners reserve their right to argue that the underpayment in tax is not attributable to a valuation overstatement within the meaning of I.R.C. §6659(a)(1), and that the Secretary should have waived the addition to tax pursuant to the provisions of I.R.C. §6659(e).

In their stipulation of settled issues, petitioners in docket No. 21847-90 (the Fredericks) conceded:  (1) The section 6621(c) interest; (2) the tax benefits claimed on their tax returns from their participation in the Plastics Recycling Program; and (3) the section 6659 addition to tax on the portion of their underpayment attributable to the disallowance of investment tax and business energy credits claimed as a result of their participation in the Plastics Recycling Program.  Respondent conceded the addition to tax under section 6661 with respect to the Fredericks' participation in the Plastics Recycling Program.

Long after the trials of these cases, petitioners in docket Nos. 16922-90 (the Gollins) and 19612-90 (the Fishbachs) each filed a Motion For Leave To File Motion For Decision Ordering Relief From the Negligence Penalty and the Penalty Rate of Interest and To File Supporting Memorandum of Law under Rule 50. These motions were filed with attached exhibits on October 30, 1995, and on October 23, 1995, respectively.  On those same dates, petitioners Gollin and Fishbach each also lodged with the Court a motion for decision ordering relief from the additions to

tax for negligence and the increased rate of interest, with attachments, and a memorandum in support of such motion. Subsequently, respondent filed objections, with attachments, and memoranda in support thereof, and petitioners Gollin and Fishbach thereafter filed reply memoranda. For reasons discussed in more detail at the end of this opinion, and also in Farrell v. Commissioner, T.C. Memo. 1996-295, these motions shall be denied. See also Grelsamer v. Commissioner, T.C. Memo. 1996-399; Zenkel v. Commissioner, T.C. Memo. 1996-398.

The issues remaining in these consolidated cases are: (1) Whether petitioners are liable for the additions to tax for negligence under the provisions of section 6653(a); and (2) whether petitioners Gollin and Fishbach are liable for additions to tax under section 6659 for underpayments of tax attributable to valuation overstatements.

FINDINGS OF FACT

Some of the facts have been stipulated in each case and are so found. The stipulated facts and attached exhibits are incorporated in the respective cases by this reference.

A. The Plastics Recycling Transactions

These cases concern petitioners' investments in three limited partnerships that leased Sentinel expanded polyethylene (EPE) recyclers: SAB Resource Recovery Associates (SAB Recovery), SAB Resource Recycling Associates (SAB Recycling), and SAB Resource Reclamation Associates (SAB Reclamation).

Petitioners Gollin are limited partners in SAB Reclamation; petitioners Fishbach are limited partners in SAB Recovery and SAB Recycling;[2] and petitioners Fredericks are limited partners in SAB Recycling. For convenience, we refer to these partnerships collectively as the Partnerships.

The transactions involving the Sentinel EPE Recyclers leased by the Partnerships are substantially identical to those in the Clearwater Group limited partnership (Clearwater), the partnership considered in Provizer v. Commissioner, T.C. Memo. 1992-177. Petitioners have stipulated substantially the same facts concerning the underlying transactions as we found in the Provizer case.

In the Provizer case, Packaging Industries, Inc. (PI), manufactured and sold six Sentinel EPE recyclers to ECI Corp. for $981,000 each. ECI Corp., in turn, resold the recyclers to F & G Corp. for $1,162,666 each. F & G Corp. then leased the recyclers to Clearwater, which licensed the recyclers to FMEC Corp., which sublicensed them back to PI. The sales of the recyclers from PI to ECI Corp. were financed with nonrecourse notes. Approximately 7 percent of the sales price of the recyclers sold by ECI Corp. to F & G Corp. was paid in cash with the remainder financed through notes. These notes provided that 10 percent of the notes

---

[2] The Fishbachs' interest in SAB Recovery and SAB Recycling was acquired through the law firm in which Myron Fishbach was a named partner during 1981 and 1982, Zimmer, Fishbach & Hertan.

were recourse but that the recourse portion of the notes was only due after the nonrecourse portion, 90 percent, was paid in full.

All of the monthly payments required among the entities in the above transactions offset each other.  These transactions were done simultaneously.  Although the recyclers were sold and leased for the above amounts under the structure of simultaneous transactions, the fair market value of a Sentinel EPE recycler in 1981 and 1982 was not in excess of $50,000.

PI allegedly sublicensed the recyclers to entities that would use them to recycle plastic scrap.  The sublicense agreements provided that the end-users would transfer to PI 100 percent of the recycled scrap in exchange for a payment from FMEC Corp. based on the quality and amount of recycled scrap.

Like Clearwater, each of the Partnerships leased Sentinel EPE recyclers from F & G Corp. and licensed those recyclers to FMEC Corp.  The transactions of the Partnerships differ from the underlying transactions in the Provizer case in the following respects:  (1) The entity that leased the machines from F & G Corp. and licensed them to FMEC Corp., and (2) the number of machines sold, leased, licensed, and sublicensed.  SAB Recovery and SAB Recycling each leased and licensed seven Sentinel EPE recyclers.  SAB Reclamation was to lease and license eight recyclers, according to its offering memorandum, but the SAB Reclamation partnership tax return for 1982 indicates that it leased and licensed only four recyclers.

For convenience, we refer to the series of transactions among PI, ECI Corp., F & G Corp., each of the Partnerships, FMEC Corp., and PI as the Partnership transactions. In addition to the Partnership transactions, a number of other limited partnerships entered into transactions similar to the Partnership transactions, also involving Sentinel EPE recyclers and Sentinel expanded polystyrene (EPS) recyclers. We refer to these collectively as the Plastics Recycling transactions.

B. The Partnerships

SAB Recovery, SAB Recycling, and SAB Reclamation are New York limited partnerships. SAB Recovery was formed in late 1981; SAB Recycling and SAB Reclamation were formed in early 1982. All three partnerships were organized and promoted by Stuart Becker (Becker), a certified public accountant (C.P.A.) and the founder and principal owner of Stuart Becker & Co., P.C. (Becker Co.), an accounting firm that specialized in tax matters. Becker organized a total of six recycling partnerships (the SAB Recycling Partnerships). Two of the SAB Recycling Partnerships closed in late 1981, two closed in early 1982, and two more closed in late 1982.

The general partner of each of the SAB Recycling Partnerships, including SAB Recovery, SAB Recycling, and SAB Reclamation, is SAB Management Ltd. (SAB Management). SAB Management is wholly owned by Scanbo Management Ltd. (Scanbo), which is wholly owned by Becker. Scanbo is an acronym for the

names of three of Becker's children:  Scott, Andy, and Bonnie.
The officers and directors of SAB Management and Scanbo are as
follows:  (1) Becker, president and director; (2) Noel Tucker
(Tucker), vice president, treasurer, and director; and (3) Steven
Leicht (Leicht), vice president, secretary, and director.  During
the years in issue, Tucker and Leicht also worked at Becker Co.
Tucker was vice president.  Each owned approximately 5 to 7
percent of the stock of Becker Co.  SAB Management did not engage
in any business before becoming involved with the SAB Recycling
Partnerships.

With respect to each of the Partnerships, a private
placement memorandum was distributed to potential limited
partners.  Reports by F & G Corp.'s evaluators, Dr. Stanley M.
Ulanoff (Ulanoff), a marketing consultant, and Dr. Samuel Z.
Burstein (Burstein), a mathematics professor, were appended to
the offering memoranda.  Ulanoff owns a 1.27-percent interest in
Plymouth Equipment Associates and a 4.37-percent interest in
Taylor Recycling Associates, partnerships that leased Sentinel
recyclers.  Burstein owns a 2.605-percent interest in Empire
Associates and a 5.82-percent interest in Jefferson Recycling
Associates, also partnerships that leased Sentinel recyclers.
Burstein also was a client and business associate of Elliot I.
Miller (Miller), the corporate counsel to PI.

The offering memoranda for SAB Recovery, SAB Recycling, and
SAB Reclamation state that the general partner will receive fees

from those partnerships in the respective amounts of $97,800, $97,375, and $110,000. SAB Management received fees of approximately $500,000 as the general partner of the SAB Recycling Partnerships. In addition, Becker Co. prepared the partnership returns and Forms K-1 for all of the SAB Recycling Partnerships and received fees for those services.

The offering memoranda for the Partnerships also allocate 7.5 percent of the proceeds from each offering to the payment of sales commissions and offeree representative fees. In addition, the offering memoranda provide that the respective general partners "may retain as additional compensation all amounts not paid as sales commissions or offeree representative fees." However, neither SAB Management nor Becker retained or received any sales commissions or offeree representative fees. Instead, after the closing of each SAB Recycling Partnership, Becker rebated to each investor whose investment was not subject to a sales commission or offeree representative fee an amount equal to 7.5 percent of such investor's original investment.

The offering memoranda list significant business and tax risk factors associated with investments in the Partnerships. Specifically, the offering memoranda state: (1) There is a substantial likelihood of audit by the Internal Revenue Service (IRS), and the purchase price paid by F & G Corp. to ECI Corp. probably will be challenged as being in excess of fair market value; (2) the Partnerships have no prior operating history; (3)

the general partner has no prior experience in marketing recycling or similar equipment; (4) the limited partners have no control over the conduct of the Partnerships' business; (5) there is no established market for the Sentinel EPE recyclers; (6) there are no assurances that market prices for virgin resin will remain at their current costs per pound or that the recycled pellets will be as marketable as virgin pellets; and (7) certain potential conflicts of interest exist.

C. Stuart Becker and Steven Leicht

Becker does not have an engineering background, and he is not an expert in plastics materials or plastics recycling. He received a B.S. degree in accounting from New York University in 1964 and an M.B.A. in taxation from New York University School of Business Administration in 1973. He passed the certified public accountancy test in 1967 and was the winner of the gold medal, awarded for achieving the highest score on the examination for that year. Since early 1966, Becker has practiced as a C.P.A. exclusively in the tax area. From 1964 until 1972 he worked for the accounting firm of Touche, Ross & Co., and in 1972 he joined the accounting firm of Richard A. Eisner & Co. as the partner in charge of the tax department. In 1977, Becker founded Becker Co.

Becker had considerable experience involving tax shelter transactions before he organized the SAB Recycling Partnerships. He prepared opinions regarding tax shelters' economic and tax

projections, advised individuals and companies with respect to investments in tax shelters, lectured extensively about tax shelter investments generally, and lectured and published with respect to leveraged tax shelters. Becker described a leveraged tax shelter as "a transaction where [the ratio of] the effective [tax] writeoff, which includes the value of the tax credit, * * * [to the amount invested] exceeds one to one." Becker Co. specialized in tax-advantaged investments. From 1980 to 1982, approximately 60 percent of the work done by Becker Co. involved tax sheltered and private investments. Becker has owned minority interests in general partners of numerous limited partnerships. Prior to organizing the SAB Recycling Partnerships, Becker owned 5 percent of the general partner of partnerships involved in approximately 14 transactions concerning river transportation (such as barges, tow boats, and grain elevators).

Although investment counseling was related to his firm's line of business, Becker did not consider himself in the business of providing investment advice. Becker did not normally hire other professionals for consultation or advice. In circumstances where he believed there was a need for outside advice, he would so advise the client. Between 30 and 40 of Becker's clients invested in the Plastics Recycling partnerships.

Becker learned of the Plastics Recycling transactions when a prospective client presented him with an offering memorandum

concerning the transactions in August or September 1981. Becker reviewed the offering memorandum and spoke to Miller, one of the key figures in the transactions and an acquaintance of Becker's. Miller was a shareholder of F & G Corp. and, as noted, the corporate counsel to PI. He also represented Robert Grant (Grant), the president and 100 percent owner of the stock of ECI Corp., and some of Grant's clients. Thereafter, Becker recommended the investment to the prospective client. Although the prospective client did not invest in the Plastics Recycling transactions, Becker became interested in the proposal and organized the SAB Recycling Partnerships in order to make similar investments in Sentinel EPE recyclers conveniently available to appropriate clients.

In organizing the SAB Recycling Partnerships, Becker was not allowed to change the format of the transactions or the purchase, lease, or licensing prices of the Sentinel EPE recyclers. He was allowed only to conduct a limited investigation of the proposed investments and choose whether or not to organize similar partnerships. Becker relied heavily upon the offering materials and discussions with persons involved in the matter to evaluate the Plastics Recycling transactions. He and two other members of Becker Co., Leicht and Tucker, investigated PI and visited its plant in Hyannis, Massachusetts, where they saw the Sentinel EPE recyclers. Leicht testified in docket Nos. 16922-90 and 19612-90

(the Gollin and Fishbach cases). His testimony has been disregarded with respect to docket No. 21847-90 (the Fredericks case). Tucker did not testify in any of the trials.

During his investigation of the Plastics Recycling transactions, Becker did not hire any plastics, engineering, or technical experts, or recommend that his clients do so. Becker discussed the transactions with Michael Canno (Canno) of the Equitable Bag Co., a manufacturer of paper and plastic bags. Canno never saw the recyclers or the pellets and never wrote any reports assessing the equipment or the pellets. In addition, Becker retained a law firm, Rabin & Silverman, to assist him in organizing the SAB Recycling Partnerships. See Spears v. Commissioner, T.C. Memo. 1996-341, to the effect that in employing the law firm, Becker sought particularly to protect himself against liability.

Leicht and Tucker also familiarized themselves with the Plastics Recycling transactions. Leicht has a B.A. degree in finance and accounting from Penn State University, a J.D. from SUNY Buffalo, and an LL.M. in taxation from New York University School of Law. Leicht ran a mathematical check on the numbers contained in the offering materials for Becker, but he did not test the underlying assumptions upon which they were based. He also visited PI in Hyannis and met with Miller and other insiders to the transactions. Leicht never communicated an opinion as to

the value of the recyclers other than what was presented in the offering memoranda. He has no education or expertise in plastics materials or plastics recycling.

D. Petitioners and Their Introduction to the Partnership Transactions

1. Stuart and Harriet J. Gollin

Petitioners Stuart and Harriet J. Gollin (the Gollins) resided in Scarsdale, New York, when their petition was filed. Stuart Gollin (Gollin) graduated from City College of New York in 1963 with a bachelor of business administration in accounting. Thereafter he joined the accounting firm of Touche, Ross & Co. (Touche, Ross) and within 3 to 4 years became a certified public accountant in New York and New Jersey. Gollin became a national retailing director and a senior audit partner at Touche, Ross. He was in charge of their bankruptcy and litigation practice, an accounting specialty otherwise known as "forensic accounting." In 1980 Gollin joined Laventhol and Horwath (Laventhol) and headed their retail and forensic accounting practices.

Gollin explained that forensic accounting is distinct from auditing, taxation, and consulting. Generally, it is investigatory in nature. Forensic accounting entails, inter alia, bankruptcy and insolvency work, litigation consulting, insurance claims work, white-collar crime work, securities fraud, securities investigation, and fraud investigation. As an example of the type of work a forensic accountant does, Gollin related

that in one case he was hired by a major food service company to learn whether a senior financial officer was defrauding the company. It was Gollin's job to determine the nature and amount of the fraud and to help in the potential recovery, including recovery negotiations. Gollin describes himself as "very into investigation and potential scams and the like."

Gollin acquired a 2.25-percent interest in SAB Reclamation for a gross investment of $12,500 in 1982, without taking into consideration any sales commission rebate or advance royalty distribution. As a result of his investment in SAB Reclamation, on their 1982 Federal income tax return Gollin and his wife Harriet claimed an operating loss in the amount of $10,025. Of a total of $20,928 in investment tax and business energy credits flowing from SAB Reclamation, the Gollins claimed $6,391 of the regular investment credit on their 1982 return and carried back the remainder, $4,073, to 1979,[3] and they carried back $6,919 of the business energy credit to 1979 and $3,545 to 1980. Respondent disallowed the Gollins' claimed operating loss and credits related to Gollin's investment in SAB Reclamation.

Gollin learned of the Plastics Recycling transactions and SAB Reclamation in 1981 or 1982 from Becker. The two had known

---

[3] On their 1979 Form 1040X, Amended U.S. Individual Income Tax Return, the Gollins carried back and claimed a total of $4,969 in regular investment credits. The source of the additional $896 of regular investment credits is unclear from the record in docket No. 16922-90.

each other since 1964 when Becker joined Touche, Ross, and they stayed in touch after Becker left that firm. Becker and Gollin first discussed the Plastics Recycling transactions at a social occasion. Gollin asked Becker whether he had any interesting investments, and Becker mentioned the SAB Recycling Partnerships. Becker provided Gollin with a copy of the SAB Reclamation offering memorandum and Gollin reviewed it. Gollin asked Becker whether there really was a machine and whether it passed the "kick-the-tire test" (that is, according to Gollin, whether anyone looked at it, touched it, and felt it). Becker described his visit to PI and other particulars of his investigation, such as talking to Canno. In the end, Gollin relied on Becker's judgment. According to Becker, Gollin said, "Tell me what you think I should do." Gollin was very well acquainted with Becker's background, and he knew that Becker did not have any experience in recycling, plastics technology, or engineering.

Neither of the Gollins has any education or experience in plastics materials or plastics recycling. They did not see a Sentinel EPE recycler prior to investing in SAB Reclamation. Gollin never asked to see the books and records of SAB Reclamation. At the time he made his investment, Gollin knew that there were no end-users lined up to use the machines. Gollin stipulated that he does not know whether SAB Reclamation had any assets. Gollin did not consult an independent expert in plastics materials or plastics recycling. He relied exclusively

on Becker.  The Gollins never made a profit in any year from their participation in SAB Reclamation.  This was the only investment Gollin made with Becker.

### 2.  Myron and Patricia Fishbach

Petitioners Myron and Patricia Fishbach (the Fishbachs) resided in Stamford, Connecticut, when their petition was filed. Myron Fishbach (Fishbach) attended Syracuse University and later earned a law degree at Fordham Law School in 1963.  After briefly working part time for a lawyer in Manhattan, Fishbach joined the law firm of Pollan & Zimmer in Hicksville, Long Island.  He eventually became a named partner of that firm.  Pollan & Zimmer underwent several name changes:  during taxable years 1981 and 1982 the firm was named Zimmer, Fishbach & Hertan.  For convenience, we shall refer to it, and its predecessors, as "ZFH" or "the firm."  ZFH concentrated in real estate, transactional work, commercial matters, and some litigation.  Over time the firm acquired an office in New York City, although it continued to maintain an office in Long Island.

Sometime in the late 1960's John Mosler (Mosler) of the Mosler Safe Co. hired ZFH.  Mosler had recently acquired a substantial interest in a company called Bell Television (Bell), and he wanted Fishbach to analyze the legal structure of Bell and its affiliated companies.  Touche, Ross was Bell's accounting firm at the time, and Fishbach became acquainted with Becker at meetings held at Bell.  Fishbach found that Becker was well

respected.  Sometime in the mid-1970's ZFH hired Richard Eisner &
Co. to service its accounting and financial needs.  Becker
retained the ZFH account when he left Richard Eisner & Co. and
formed Becker Co.  Apart from their interaction at Bell,
Fishbach's relationship with Becker consisted primarily of client
referrals to Becker and consultations with him on select client
financial matters.  Becker also prepared Fishbach's Federal
income tax returns.

Another partner at ZFH, Jay Hertan (Hertan), oversaw the
bookkeeping and general financial affairs of the firm.  Becker
interacted primarily with Hertan regarding ZFH's accounting and
financial needs.  Hertan had a business degree from Indiana
University, a banking degree from Northwestern University, and a
law degree from Yale Law School.  He became a member of ZFH in
1967.  Before that he represented Long Island banks and was
active in civic affairs.  His financial and banking related
experience included work as an appraiser and mortgage related
services.  In 1982 Hertan became a trustee and officer of a real
estate investment trust that operated out of an office adjacent
to ZFH's office.  Hertan often suggested investments to the firm.
As an unwritten policy, either all of the members of ZFH would
participate or the firm would not invest in the particular
venture.  ZFH invested primarily in real estate development
projects.

ZFH acquired a 4.479638-percent interest in SAB Recovery for $50,000 in 1981 and a 2.538461-percent interest in SAB Recycling for $25,000 in 1982, without taking into consideration any sales commission rebates or advance royalty distributions.[4]  As a general partner of ZFH, Fishbach is a second-tier owner of those interests.  Fishbach testified that during 1981 and 1982 he was approximately a one-third partner in ZFH.  As a result of Fishbach's second-tier interests in SAB Recycling and SAB Recovery, on their 1982 return Fishbach and his wife Patricia claimed an operating loss in the amount of $7,230 and investment tax and business energy credits in the amount of $13,743.[5] Respondent disallowed the Fishbachs' claimed operating loss and credits related to Fishbach's second-tier investments in SAB Recycling and SAB Recovery.

---

[4]    ZFH also acquired an interest in SAB Recovery Associates in 1982, but the record in docket No. 19612-90 does not disclose the size of the interest or how much ZFH paid for it.  The record indicates that SAB Recycling Associates was the subject of a separate determination and proceedings, and that a decision has since been entered with respect to that matter.  The additions to tax at issue in docket No. 19612-90 stem solely from the Fishbachs' second-tier interests in SAB Recovery and SAB Recycling.

[5]    The $7,230 loss and $13,743 in credits claimed by the Fishbachs on their 1982 return is generally consistent with a one-third interest in ZFH.  The 1982 Form K-1, Partner's Share of Income, Credits, Deductions, etc. issued by SAB Recycling for ZFH reports an ordinary loss in the amount of $19,871, and a basis in new recovery property, the Sentinel EPE recyclers, in the amount of $206,597.  $19,871/3 = $6,623.66.  $206,597/3 = $68,865.66. Applying the 10 percent investment tax credit and business energy credit computations to $68,866 yields a combined credit of $13,774 (68,866 x .1 = 6,886.6; 6,887 x 2 = 13,774).  The record does not permit more exact computations.

Fishbach learned of the Plastics Recycling transactions from Hertan. Hertan discussed the Plastics Recycling transactions with Becker. Fishbach understood that Hertan had seen the machines on a visit to PI in Hyannis, and that Hertan and Becker were exploring various aspects of the investment. Fishbach spent just a short amount of time flipping through the offering materials, looking particularly to see if he recognized any of the people involved with the Partnerships. He did not see a Sentinel EPE recycler prior to investing. Other than speaking to Hertan and Becker, Fishbach did not independently investigate the Plastics Recycling transactions. Through ZFH Fishbach invested in SAB Recovery in 1981 and SAB Recycling in 1982. He did not monitor his plastics recycling investments or, for that matter, any investments made by the firm. The Fishbachs never made a profit in any year from their participation in the Plastics Recycling transactions. Neither of the Fishbachs has any education or work experience in plastics, and Fishbach did not know whether Hertan or Becker had any education or experience in plastics.

### 3. Charles Fredericks, Jr. and Stephanie Fredericks

Petitioners Charles Fredericks, Jr. and Stephanie Fredericks (the Fredericks) resided in New York, New York, when their petition was filed. Charles Fredericks, Jr. (Fredericks) earned an undergraduate degree from Princeton University and a law degree from Harvard Law School in 1948. After he was admitted to

the New York State bar, Fredericks practiced law for about one year with his father, a real estate attorney in New York City. He then pursued a very successful career in advertising beginning in approximately 1950. Fredericks spent the first 20 years of his advertising career at Ogilvy & Mather and rose to executive vice president of that agency. Thereafter, Fredericks served as the president, chief operating officer, and as a director of an advertising agency in which he held a major amount of stock, Wells, Rich, Greene.

In addition to the foregoing, from 1970 through the years in issue, Fredericks served as a director of Product Design and Engineering (PDE), a corporation located in Minneapolis, Minnesota. PDE manufactures polyethylene and polystyrene closures for consumer packaged goods as well as all kinds of small plastic parts. The president and principal stockholder of PDE during that time was A. J. Porter (Porter), a graduate of the University of Minnesota and a licensed engineer. Fredericks explained that the closures and other plastic parts manufactured by PDE are molded from raw material under hot presses. During the mid to late 1970's, in order to economize its purchases of raw material, PDE began recycling its scrap plastic. Scrap plastic was run through grinders--no other processing was necessary--and fed into another batch to be molded.

In October of 1981, Fredericks sought to leave the employ of

Wells, Rich, Greene.  Fredericks hired an attorney, Robert Stephen Cohen (Cohen), to negotiate a settlement of his contract, and Cohen enlisted the assistance of Becker.  The Fredericks and Cohen met with Becker, and they determined that his contract was worth between $3.5 million and $4 million.  Cohen then negotiated a settlement package that had a present value, at that time, of approximately $1,750,000.  Under the terms of the settlement, Fredericks was to continue as a consultant to Wells, Rich, Greene for a 4-year period at $250,000 a year, and thereafter he would receive $30,000 a year for life.

Cohen told Fredericks that Becker could give Fredericks and his wife Stephanie financial advice, investment advice, and tax advice.  Fredericks was familiar with one of Becker's earlier investment ventures, a physicians' leisure magazine in which Fredericks had placed advertisements for clients.  He and Becker entered into a retainer agreement for tax services.  Becker Co. agreed to provide income tax planning and tax return preparation services for 1982, in addition to recommending tax-oriented investments.  The agreement provided:

> [Becker Co.] will perform an analysis of your past and present tax status in order to properly reflect on your current and future tax shelter needs.  [Becker Co.] will continually seek such tax sheltered investments which are appropriate for you and which make sense from an economic point of view.

Robert Steele (Steele) of Becker Co. handled the Fredericks' account.  Fredericks dealt with Steele on a regular basis and met

with Becker for lunch or coffee every 2 or 3 months. Steele did not testify at the trial in docket No. 21847-90.

Fredericks acquired a 5.076923-percent interest in SAB Recycling for $50,000 in 1982, without taking into consideration any sales commission rebate or advance royalty distribution. As a result of his investment in SAB Recycling, on their 1982 return he and his wife Stephanie claimed an operating loss in the amount of $39,741 and investment tax and business energy credits in the amount of $82,638. Respondent disallowed the Fredericks' claimed operating loss and credits related to his investment in SAB Recycling.

Fredericks learned about the Plastics Recycling transactions and SAB Recycling from Becker in 1982. Becker had forwarded at least 6 prospectuses to Fredericks in early 1982, one of which was for SAB Recycling. SAB Recycling was the only one of those investments that interested Fredericks. Fredericks reviewed the SAB Recycling offering memorandum. He did not understand most of the material outlining the structure of the leasing transactions. Fredericks claims he did not notice any conflicts of interest problems with F & G Corp.'s evaluators or that Becker would be receiving a general partner fee. At trial he could not recall reading that the projected losses and credits for the first year would exceed the amount of his investment.

After reviewing the offering memorandum, Fredericks

telephoned Porter to ask him whether he thought a polyethylene or polystyrene recycler was viable, and he also called Cohen and asked him if he would review the transaction.  Fredericks understood from Cohen that Cohen had invested in at least one plastics recycling partnership in 1981 and that SAB Recycling was virtually the same.  He also understood that Cohen thought it was a good deal with good tax advantages.  Fredericks did not ask Cohen if he had received any royalty distributions.  He did not consider Cohen to be an engineer or an expert in plastics recycling.  According to Fredericks, Porter thought a polyethylene or polystyrene recycler was economically viable depending upon the price of oil.  Fredericks did not otherwise discuss plastics recycling with Porter.  He did not inform Porter of, or ask for his opinion about, the Sentinel EPE recycler or the Plastics Recycling transactions; he did not send Porter a copy of the offering memorandum; he did not tell Porter what machine he was investing in; he did not describe the machine to Porter; he did not tell Porter the price of the machine; and he did not ask Porter if there were any comparable machines already on the market.  Porter and Cohen did not testify at the trial in docket No. 21847-90.

Fredericks next spoke to Becker and Steele about SAB Recycling.  He asked Becker whether he had seen the machines and if they worked.  Becker described his visit to PI and advised

Fredericks that he would be receiving commissions as general partner,[6] which also was disclosed in the SAB Recycling offering memorandum. Fredericks discussed the impact the investment would have on his estimated tax and matters of that nature with Steele; the two did not discuss the economics of the investment. The Fredericks do not have any education or experience in engineering or plastics recycling. Becker and Steele never said that they were expert in engineering or plastics recycling, and Fredericks never thought they had expertise on these subjects. Fredericks did not ask Becker on whom he relied in conducting his investigation or whether he consulted any independent experts unrelated to SAB Recycling, the promoters, or F & G Corp. He did not ask Becker if he had any conflict of interest. Fredericks did not ask Becker how many machines would be placed by PI or if there were any similar recyclers already on the market. The Fredericks did not see a Sentinel EPE or EPS Recycler prior to their investment in SAB Recycling. They did not know whether the machines were unique at the time of their investment. The Fredericks never made a profit in any year from their participation in SAB Recycling.

---

[6] At trial, Becker was asked, "Did you advise Mr. Fredericks that you would be receiving commissions as a general partner for this investment?" Becker answered, "Yes, I did." However, Becker did refund 7.5 percent of Fredericks' investment, which represented the offeree representative fee.

OPINION

We have decided a large number of the Plastics Recycling group of cases.[7] The majority of these cases, like the consolidated cases herein, raised issues regarding additions to tax for negligence and valuation overstatement. We have found the taxpayers liable for such additions to tax in all but one of

_____

[7] Provizer v. Commissioner, T.C. Memo. 1992-177, affd. without published opinion 996 F.2d 1216 (6th Cir. 1993), concerned the substance of the partnership transaction and also the additions to tax.

The following cases concerned the addition to tax for negligence, inter alia: Grelsamer v. Commissioner, T.C. Memo. 1996-399; Zenkel v. Commissioner, T.C. Memo. 1996-398; Estate of Busch v. Commissioner, T.C. Memo. 1996-342; Spears v. Commissioner, T.C. Memo. 1996-341; Stone v. Commissioner, T.C. Memo. 1996-230; Reimann v. Commissioner, T.C. Memo. 1996-84; Bennett v. Commissioner, T.C. Memo. 1996-14; Atkind v. Commissioner, T.C. Memo. 1995-582; Triemstra v. Commissioner, T.C. Memo. 1995-581; Pace v. Commissioner, T.C. Memo. 1995-580; Dworkin v. Commissioner, T.C. Memo. 1995-533; Wilson v Commissioner, T.C. Memo. 1995-525; Avellini v. Commissioner, T.C. Memo. 1995-489; Paulson v. Commissioner, T.C. Memo. 1995-387; Zidanich v. Commissioner, T.C. Memo. 1995-382; Ramesh v. Commissioner, T.C. Memo. 1995-346; Reister v. Commissioner, T.C. Memo. 1995-305; Fralich v. Commissioner, T.C. Memo. 1995-257; Shapiro v. Commissioner, T.C. Memo. 1995-224; Pierce v. Commissioner, T.C. Memo. 1995-223; Fine v. Commissioner, T.C. Memo. 1995-222; Pearlman v. Commissioner, T.C. Memo. 1995-182; Kott v. Commissioner, T.C. Memo. 1995-181; Eisenberg v. Commissioner, T.C. Memo. 1995-180.

Greene v. Commissioner, 88 T.C. 376 (1987), concerned the applicability of the safe-harbor leasing provisions of sec. 168(f)(8). Trost v. Commissioner, 95 T.C. 560 (1990), concerned a jurisdictional issue.

Farrell v. Commissioner, T.C. Memo. 1996-295; Baratelli v. Commissioner, T.C. Memo. 1994-484; Estate of Satin v. Commissioner, T.C. Memo. 1994-435; Fisher v. Commissioner, T.C. Memo. 1994-434; Foam Recycling Associates v. Commissioner, T.C. Memo. 1992-645; Madison Recycling Associates v. Commissioner, T.C. Memo. 1992-605, concerned other issues.

the opinions to date on these issues, although procedural rulings

have involved many more favorable results for taxpayers.[8]

In Provizer v. Commissioner, T.C. Memo. 1992-177, a test

case for the Plastics Recycling group of cases, this Court (1)

found that each Sentinel EPE recycler had a fair market value not

in excess of $50,000, (2) held that the transaction, which is

almost identical to the Partnership transactions in these

consolidated cases, was a sham because it lacked economic

substance and a business purpose, (3) upheld the section 6659

addition to tax for valuation overstatement since the

underpayment of taxes was directly related to the overstatement

of the value of the Sentinel EPE recyclers, and (4) held that

losses and credits claimed with respect to Clearwater were

attributable to tax-motivated transactions within the meaning of

section 6621(c). In reaching the conclusion that the transaction

lacked economic substance and a business purpose, this Court

---

[8]     In Zidanich v. Commissioner, T.C. Memo. 1995-382, we held
the taxpayers liable for the sec. 6659 addition to tax, but not
liable for the negligence additions to tax under sec. 6653(a).
As indicated in our opinion, the Zidanich case, and the Steinberg
case consolidated with it for opinion, involved exceptional
circumstances.
    In Estate of Satin v. Commissioner, supra, and Fisher v.
Commissioner, supra, after the decision in Provizer v.
Commissioner, supra, the taxpayers were allowed to elect to
accept a beneficial settlement because of exceptional
circumstances. In Farrell v. Commissioner, supra, we rejected
taxpayers' claim to a similar belated settlement arrangement
since the circumstances were different and taxpayers previously
had rejected settlement and elected to litigate the case. See
also Baratelli v. Commissioner, supra; Zenkel v. Commissioner,
supra.

relied heavily upon the overvaluation of the Sentinel EPE recyclers.

Although petitioners have not agreed to be bound by the Provizer opinion, they have stipulated that the investments in the Sentinel EPE recyclers in these cases are similar to the investment described in Provizer v. Commissioner, supra. The underlying transactions in these consolidated cases, and the Sentinel EPE recyclers considered in these cases, are the same type of transaction and same type of machines considered in Provizer v. Commissioner, supra.

Based on the entire records in these cases, including the extensive stipulations, testimony of respondent's experts, and petitioners' testimony, we hold that each of the Partnership transactions herein was a sham and lacked economic substance. In reaching this conclusion, we rely heavily upon the overvaluation of the Sentinel EPE recyclers. Respondent is sustained on the question of the underlying deficiencies. We note that petitioners have explicitly conceded this issue in the respective stipulations of settled issues filed shortly before trial. The records plainly support respondent's determinations regardless of such concessions. For a detailed discussion of the facts and the applicable law in a substantially identical case, see Provizer v. Commissioner, supra.

A. Section 6653(a)--Negligence

In notices of deficiency, respondent determined that each of

petitioners was liable for the additions to tax for negligence under section 6653(a)(1) and (2) for 1982, and in the case of the Gollins, under section 6653(a) for 1979 and 1980 as well. Petitioners have the burden of proving that respondent's determinations of these additions to tax are erroneous.[9]  Rule 142(a); Luman v. Commissioner, 79 T.C. 846, 860-861 (1982).

Section 6653(a) for 1979 and 1980 and section 6653(a)(1) for 1982 impose an addition to tax equal to 5 percent of the underpayment if any part of an underpayment of tax is due to negligence or intentional disregard of rules or regulations. Section 6653(a)(2) imposes an addition to tax equal to 50 percent of the interest payable with respect to the portion of the underpayment attributable to negligence or intentional disregard of rules or regulations.

Negligence is defined as the failure to exercise the due care that a reasonable and ordinarily prudent person would employ under the circumstances.  Neely v. Commissioner, 85 T.C. 934, 947 (1985).  The question is whether a particular taxpayer's actions in connection with the transactions were reasonable in light of his experience and the nature of the investment or business.  See

---

[9]    In an amendment to the answer, respondent asserted that the interest due from petitioner Fishbach under sec. 6653(a)(2) was to be computed on an underpayment of $17,445 instead of $11,767. However, by order dated Apr. 1, 1994, the burden of proof was placed on petitioners Fishbach "with respect to the negligence issues".  The shifting of the burden of proof in respect of sec. 6653(a)(2) was ordered as a sanction under Rule 104(c).

Henry Schwartz Corp. v. Commissioner, 60 T.C. 728, 740 (1973).
When considering the negligence addition to tax, we evaluate the
particular facts of each case, judging the relative
sophistication of the taxpayers, as well as the manner in which
they approached their investment. McPike v. Commissioner, T.C.
Memo. 1996-46. Compare Spears v. Commissioner, T.C. Memo. 1996-
341, with Zidanich v. Commissioner, T.C. Memo. 1995-382.

Petitioners argue that they were reasonable in claiming
deductions and credits with respect to the Partnerships. They
maintain that they reasonably expected an economic profit in
light of the so-called oil crisis in the United States in 1981
and 1982, and that they reasonably relied upon the offering
materials and one or more qualified advisers. Petitioners each
claim to have relied on Becker. In addition, Fishbach maintains
that he also relied on Hertan, and Fredericks contends that he
also relied on Steele, Cohen, and Porter.

### 1. The So-Called Oil Crisis

Petitioners contend that they reasonably expected to make an
economic profit from the Partnership transactions because plastic
is an oil derivative and the United States was experiencing a so-
called oil crisis during the years 1981 and 1982. In support of
this argument, petitioners cite Krause v. Commissioner, 99 T.C.
132 (1992), affd. sub nom. Hildebrand v. Commissioner, 28 F.3d
1024 (10th Cir. 1994) and Von Scoyoc v. Commissioner, T.C. Memo.
1988-520, affd. without published opinion 898 F.2d 149 (4th Cir.

1990).

Petitioners' assertion that they reasonably expected an economic profit from the Partnership transactions is not credible. Petitioners did not seriously review the offering memoranda, investigate the Plastics Recycling transactions, or otherwise educate themselves in plastics recycling. Moreover, testimony by one of respondent's experts establishes that the oil pricing changes during the late 1970's and early 1980's did not justify petitioners' claiming excessive investment credits and purported losses based on vastly exaggerated valuations of recycling machinery.

Petitioners' failure seriously to learn about the Partnership transactions undermines their contention that they reasonably expected an economic profit from them. Gollin was an experienced forensic accountant who described himself as "very into investigation and potential scams and the like," yet he did not ask to see SAB Reclamation's books and records, nor did he see a Sentinel EPE recycler prior to investing. Also, Gollin knew there were no end-users committed to the transaction, and he stipulated that he does not know whether SAB Reclamation had any assets. Fishbach was unsure if he had read the offering memoranda, but speculated that he spent just a short amount of time perusing them and that he flipped through the risk factors. Asked if he reviewed the financial projections, Fishbach replied, "Absolutely not." Fredericks did not understand most of the

material in the SAB Recycling offering memorandum describing the structure of the transaction.  He testified that he was unaware that F & G Corp.'s evaluators had any conflicts of interest, that Becker was the de facto general partner of SAB Recycling, or that Becker would be receiving a fee as such.  Yet the offering memorandum disclosed Becker's ownership of SAB Management, the fees accruing to the general partner, and also explained that Miller was the attorney for and a business associate of Burstein. Fredericks' discussion with Porter, who may have had some insight into plastics and/or plastics recycling, did not address the Sentinel EPE recycler or the Plastics Recycling transactions.  In light of petitioners' lack of knowledge about and perfunctory investigations of the Partnership transactions, we find their claim that they reasonably expected an economic profit from the Partnerships unconvincing, even taking into consideration the so-called oil crisis.

Moreover, petitioners did not explain how the so-called oil crisis provided a reasonable basis for them to invest in the Partnerships and claim the associated tax deductions and credits. The offering materials warned that there could be no assurances that prices for new resin pellets would remain at their then current level.  One of respondent's experts, Steven Grossman, explained that the price of plastics materials is not directly proportional to the price of oil.  In his report, he stated that less than 10 percent of crude oil is utilized for making plastics

materials and that studies have shown that "a 300% increase in crude oil prices results in only a 30 to 40% increase in the cost of plastics products."  Furthermore, during 1980 and 1981, in addition to the media coverage of the so-called oil crisis, there was "extensive continuing press coverage of questionable tax shelter plans."  Zmuda v. Commissioner, 731 F.2d 1417, 1422 (9th Cir. 1984), affg. 79 T.C. 714 (1982).

Petitioners' reliance on Von Scoyoc v. Commissioner, supra, is misplaced.  In Von Scoyoc, the taxpayer purchased a sailboat for use in the charter business.  This Court held that the taxpayer did not engage in the charter activity for profit, but declined to sustain the negligence additions to tax.  The taxpayer had been motivated in part by a Wall Street Journal article stating that sailboat prices had been appreciating for several years at the time.  This Court noted that members of the boating industry attributed this to several factors, one of which was the energy crisis of the early and mid-1970's.  In contrast, the Sentinel EPE recyclers had no documented profit or appreciation history, and the speculative influence of the so-called oil crisis was the primary, if not only, factor upon which petitioners purport to have based their profit hopes.  We consider Von Scoyoc v. Commissioner, supra, inapplicable under the facts of petitioners' cases herein.

Petitioners' reliance on Krause v. Commissioner, supra, is misplaced.  The facts in Krause v. Commissioner, supra, are

distinctly different from the facts of these cases. In the
Krause case, the taxpayers invested in limited partnerships whose
investment objectives concerned enhanced oil recovery (EOR)
technology. The Krause opinion states that during the late
1970's and early 1980's, the Federal Government adopted specific
programs to aid research and development of EOR technology. Id.
at 135-136. In holding that the taxpayers in the Krause case
were not liable for the negligence additions to tax, this Court
noted that one of the Government's expert witnesses acknowledged
that "investors may have been significantly and reasonably
influenced by the energy price hysteria that existed in the late
1970's and early 1980's to invest in EOR technology." Id. at
177. In the present cases, however, as explained by respondent's
expert Steven Grossman, the price of plastics materials was not
directly proportional to the price of oil, and there is no
persuasive evidence that the so-called oil crisis had a
substantial bearing on petitioners' decisions to invest. While
EOR was, according to our Krause opinion, in the forefront of
national policy and the media during the late 1970's and 1980's,
there is no showing in these records that the so-called energy
crisis would provide a reasonable basis for petitioners'
investing in recycling of polyethylene, particularly in the
machinery here in question.

In addition, the taxpayers in the Krause opinion were
experienced in or investigated the oil industry and EOR

technology specifically. One of the taxpayers in <u>Krause v.</u> <u>Commissioner</u>, 99 T.C. 132 (1992), undertook significant investigation of the proposed investment including researching EOR technology. The other taxpayer was a geological and mining engineer whose work included research of oil recovery methods and who hired an independent geologic engineer to review the offering materials. <u>Id.</u> at 166. In the present cases, petitioners were not experienced or educated in plastics recycling. They did not independently investigate the Sentinel recyclers or hire an expert in plastics to evaluate the Partnership transactions. We consider petitioners' arguments with respect to the <u>Krause</u> case inapplicable.

### 2. Petitioners' Purported Reliance on Tax Advisers

Petitioners maintain that they reasonably relied upon the advice of qualified advisers. Gollin contends that he reasonably relied on Becker; Fredericks contends that he reasonably relied upon Becker, Steele, Cohen, and Porter; and Fishbach contends that he reasonably relied upon Hertan and Becker.

The concept of negligence and the argument of reliance on an expert are highly fact intensive. Petitioners in these cases are very well educated professionals: Two are lawyers and the third is a forensic accountant. These professionals ultimately relied upon an accountant to investigate the tax law and the underlying business circumstances of a proposed investment, the success of

which depended upon a purportedly technologically unique machine. Becker, who is experienced in tax matters, explains that he made an investigation within the limits of his resources and abilities and fully disclosed what he had done. The question here is whether petitioners actually and reasonably relied on the accountant with respect to valuation problems requiring expertise in engineering and plastics technology, or whether the accountant gave the tax advice, facilitated the transaction, but did not make a full and independent investigation of the relevant business and technology, and did clearly inform his clients of the limits of his knowledge and investigation of the transaction. For reasons set forth below, we believe the latter statement more accurately describes what happened here.

### a. The Circumstances Under Which a Taxpayer May Avoid Liability Under Section 6653(a)(1) and (2) Because of Reasonable Reliance on Competent and Fully Informed Professional Advice

A taxpayer may avoid liability for the additions to tax under section 6653(a)(1) and (2), and the former section 6653(a), if he or she reasonably relied on competent professional advice. United States v. Boyle, 469 U.S. 241, 250-251 (1985); Freytag v. Commissioner, 89 T.C. 849, 888 (1987), affd. 904 F.2d 1011 (5th Cir. 1990), affd. 501 U.S. 868 (1991). Reliance on professional advice, standing alone, is not an absolute defense to negligence, but rather a factor to be considered. Freytag v. Commissioner, supra. For reliance on professional advice to excuse a taxpayer

from the negligence additions to tax, the taxpayer must show that such professional had the expertise and knowledge of the pertinent facts to provide informed advice on the subject matter. David v. Commissioner, 43 F.3d 788, 789-790 (2d Cir. 1995), affg. T.C. Memo. 1993-621; Goldman v. Commissioner, 39 F.3d 402 (2d Cir. 1994), affg. T.C. Memo. 1993-480; Freytag v. Commissioner, supra; Sacks v. Commissioner, T.C. Memo. 1994-217, affd. 82 F.3d 918 (9th Cir. 1996); Kozlowski v. Commissioner, T.C. Memo. 1993-430, affd. without published opinion 70 F.3d 1279 (9th Cir. 1995); see also Stone v. Commissioner, T.C. Memo. 1996-230; Reimann v. Commissioner, T.C. Memo. 1996-84.

Reliance on representations by insiders, promoters, or offering materials has been held an inadequate defense to negligence. Goldman v. Commissioner, supra; Pasternak v. Commissioner, 990 F.2d 893 (6th Cir. 1993), affg. Donahue v. Commissioner, T.C. Memo. 1991-181; LaVerne v. Commissioner, 94 T.C. 637, 652-653 (1990), affd. without published opinion 956 F.2d 274 (9th Cir. 1992), affd. without published opinion sub nom. Cowles v. Commissioner, 949 F.2d 401 (10th Cir. 1991); Marine v. Commissioner, 92 T.C. 958, 992-993 (1989), affd. without published opinion 921 F.2d 280 (9th Cir. 1991); McCrary v. Commissioner, 92 T.C. 827, 850 (1989); Rybak v. Commissioner, 91 T.C. 524, 565 (1988). Pleas of reliance have been rejected when neither the taxpayer nor the advisers purportedly relied upon by the taxpayer knew anything about the nontax business

aspects of the contemplated venture.  David v. Commissioner,
supra, Goldman v. Commissioner, supra; Freytag v. Commissioner,
supra; Beck v. Commissioner, 85 T.C. 557 (1985); Lax v.
Commissioner, T.C. Memo. 1994-329, affd. without published
opinion 72 F.3d 123 (3d Cir. 1995); Sacks v. Commissioner, supra;
Steerman v. Commissioner, T.C. Memo. 1993-447; Rogers v.
Commissioner, T.C. Memo. 1990-619; see also the Plastics
Recycling cases cited supra note 8.

### b.  Becker

Becker had no education, special qualifications, or
professional skills in plastics engineering, plastics recycling,
or plastics materials.  In evaluating the Plastics Recycling
transactions and organizing the SAB Recycling Partnerships,
Becker supposedly relied upon:  (1) The offering materials; (2) a
tour of the PI facility in Hyannis; (3) discussions with insiders
to the transactions; (4) Canno; and (5) his investigation of the
reputation and background of PI and persons involved in the
transactions.

Despite his lack of knowledge regarding the product, the
target market, and the technical aspects at the heart of the
Plastics Recycling transactions, Becker did not hire an expert in
plastics materials or plastics recycling, or recommend that his
clients do so.  The only independent person having any connection
with the plastics industry with whom Becker spoke was Canno.  A
client of Becker Co., Canno was a part owner and the production

manager of Equitable Bag Co., a manufacturer of paper and plastic bags. Becker spoke to Canno about the recyclers and PI, but did not hire or pay him for any advice. Canno did not visit the PI plant in Hyannis, see or test a Sentinel EPE recycler, or see or test any of the output from a Sentinel EPE recycler or the recycled resin pellets after they were further processed by PI. According to Becker, Canno endorsed the Partnership transactions after reviewing the offering materials. Asked at trial if Canno had done any type of comparables analysis, Becker replied, "I don't know what Mr. Canno did."

Becker visited the PI plant in Hyannis, toured the facility, viewed a Sentinel EPE recycler in operation, and saw products that were produced from recycled plastic. Becker claims that during his visit, he was told that the recycler was unique and that it was the only machine of its type. In fact, the Sentinel EPE recycler was not unique; instead, several machines capable of densifying low density materials were already on the market. Other plastics recycling machines available during 1982 ranged in price from $20,000 to $200,000, including the Foremost Densilator, Nelmor/Weiss Densification System (Regenolux), Buss-Condux Plastcompactor, and Cumberland Granulator. See Provizer v. Commissioner, T.C. Memo. 1992-177.

Becker was also told that PI had put an enormous amount of research and development--10 to 12 years' worth--into the creation and production of the Sentinel EPE recycler. When he

asked to see the cost records for some kind of independent verification, however, his request was denied. Becker was informed that such information was proprietary and secret, and that he would just have to take PI's representations as true. Although PI claimed that all of its information was a trade secret, and that it never obtained patents on any of its machines, PI had in fact obtained numerous patents prior to the recycling transactions and had also applied for a trademark for the Sentinel recyclers. Becker decided to accept PI's representations after speaking with Miller (the corporate counsel to PI), Canno (who had never been to PI's plant or seen a Sentinel EPE recycler), and a surrogate judge from Rhode Island who did business in the Boston/Cape Cod area (and who had no expertise in engineering or plastics materials). Becker testified that he was allowed to see PI's internal accounting controls regarding the allocation of royalty payments and PI's recordkeeping system in general. In Provizer v. Commissioner, supra, this Court found that "PI had no cost accounting system or records."

Becker confirmed at trial that he relied on the offering materials and discussions with PI personnel to establish the value and purported uniqueness of the recyclers. Becker testified that he relied upon the reports of Ulanoff and Burstein contained in the offering materials, despite the fact: (1) Ulanoff's report did not contain any hard data to support his

opinion; (2) Ulanoff was not an economics or plastics expert; (3) Becker did not know whether Burstein was an engineer; and (4) Burstein was a client of Miller's and was not an independent expert. In addition, Ulanoff and Burstein each owned an interest in more than one partnership that owned Sentinel recyclers as part of the Plastics Recycling Program.

Becker explained at trial that in the course of his practice when evaluating prospective investments for clients, he focuses on the economics of the transaction and investigates whether there is a need or market for the product or service. With respect to the Partnership transactions, the records indicate that Becker overlooked several red flags regarding the economic viability and market for the Sentinel EPE recyclers. The offering memoranda for the Partnership transactions warned that there was no established market for the Sentinel EPE recyclers. Becker never saw any marketing plans for selling the pellets or leasing the recyclers. He accepted representations by PI personnel that they would be marketing the recyclers to clients and that there was a sufficient base of end-users for the machines; yet he never saw PI's client list. At the time of the closing of the Partnerships, Becker did not know who the end-users were or if there were any end-users actually committed to the transaction.

Becker purportedly checked the price of the pellets by reading trade journals of the plastics industry. However, he did

not use those same journals to investigate the recyclers' purported value or to see whether there were any advertisements for comparable machines.  The records in these cases do not indicate that any of petitioners or their advisers other than Becker asked to see those journals for their own examination.  In concluding that the Partnerships would be economically profitable, Becker made two assumptions that he concedes were unsupported by any hard data:  (1) That there was a market for the pellets; and (2) that market demand for them would increase.

Becker had a financial interest in SAB Recovery, SAB Recycling, SAB Reclamation, and the SAB Recycling Partnerships generally.  He received fees in excess of $500,000 with respect to the SAB Recycling Partnerships, more than $300,000 of which was derived from SAB Recovery, SAB Recycling, and SAB Reclamation.  Becker also received fees for investment advice from some individual investors, including Fredericks but not Gollin or Fishbach.  In addition, Becker Co. received fees from the SAB Recycling Partnerships for preparing their partnership returns.  As Becker himself testified, potential investors could not have read the offering materials and been ignorant of the financial benefits accruing to him.

We find that petitioners' purported reliance on Becker was not reasonable, not in good faith, nor based upon full disclosure.  Becker's expertise was in taxation, not plastics materials or plastics recycling, and his investigation and

analysis of the Plastics Recycling transactions reflected this circumstance. Gollin knew that Becker was not an engineer or expert in plastics materials or plastics recycling, and Fishbach and Fredericks had no reason to believe otherwise. Becker testified that he was very careful not to mislead any of his clients regarding the particulars of his investigation. As he put it: "I don't recall saying to a client I did due diligence * * * [Rather,] I told [my clients] precisely what I had done to investigate or analyze the transaction. I didn't just say I did due diligence, and leave it open for them to define what I might or might not have done."

The purported value of the Sentinel EPE recycler generated the deductions and credits in these cases, and that circumstance was reflected in the offering memoranda. Certainly Becker recognized the nature of the tax benefits and, given their education and professional experience, petitioners should have recognized it as well. Yet neither petitioners nor Becker verified the purported value of the Sentinel EPE recycler. Petitioners ultimately relied on Becker, and Becker confirmed at trial that he relied on PI for the value of the Sentinel EPE recyclers. Investors as sophisticated as petitioners either learned or should have learned the source and shortcomings of Becker's valuation information when he "precisely" disclosed "what [he] had done to investigate or analyze the transaction."

Gollin was a partner in an accounting firm and had nearly 20 years' experience as a forensic accountant investigating "potential scams and the like." Fishbach was a named partner in a law firm in which he had been practicing for nearly 20 years, and through which he had made a number of investments locally and nationally. Fredericks was the president and chief operating officer of a successful advertising agency and a board member of a plastics molding company that was recycling plastic scrap. Certainly petitioners possessed the resources and acumen properly to investigate the Partnership transactions. We hold that petitioners did not reasonably or in good faith rely on Becker as an expert or a qualified professional working in the area of his expertise to establish the fair market value of the Sentinel EPE recycler and economic viability of the Partnership transactions. Becker never assumed such responsibility, and he fully described the particulars of his investigation, taking care not to mischaracterize it as "due diligence."

In the end, Becker and petitioners relied on PI personnel for the value of the Sentinel EPE recyclers and the economic viability of the Partnership transactions. See <u>Vojticek v. Commissioner</u>, T.C. Memo. 1995-444, to the effect that advice from such persons "is better classified as sales promotion." Becker did not have any education, special qualifications, or professional skills in plastics materials or plastics recycling.

A taxpayer may rely upon his adviser's expertise (in these cases accounting and tax advice), but it is not reasonable or prudent to rely upon a tax adviser regarding matters outside of his field of expertise or with respect to facts that he does not verify. See David v. Commissioner, 43 F.3d at 789-790; Goldman v. Commissioner, 39 F.3d at 408; Skeen v. Commissioner, 864 F.2d 93 (9th Cir. 1989), affg. Patin v. Commissioner, 88 T.C. 1086 (1987); Lax v. Commissioner, T.C. Memo. 1994-329; Sacks v. Commissioner, T.C. Memo. 1994-217; Rogers v. Commissioner, T.C. Memo. 1990-619; see also Grelsamer v. Commissioner, T.C. Memo. 1996-399; Zenkel v. Commissioner, T.C. Memo. 1996-398; Estate of Busch v. Commissioner, T.C. Memo. 1996-342; Spears v. Commissioner, T.C. Memo. 1996-341, with respect to Becker's advice in Plastics Recycling cases.

### c. Hertan

Fishbach learned of the Plastics Recycling transactions from Hertan, his partner at ZFH. Hertan oversaw the bookkeeping and general financial affairs of ZFH. He and Fishbach lived near each other and carpooled in and out of Manhattan. With respect to the Partnership transactions, Fishbach testified that Hertan "found an investment that he thought was of interest" and that he mentioned visiting Hyannis to look at some equipment. Asked if Hertan gave him a report about what he found at Hyannis, Fishbach replied:

> Well, generally he would just, you know, talk about it
> * * * We had sort of a balancing out process.  He would
> talk about something looked good and I would say, great
> * * * It was sort of implicit in our relationship at
> that time and the things we did that [Hertan] would go
> about evaluating things * * *.

Fishbach knew that Hertan had spoken to Becker about the investment.  Fishbach testified that he did not know if Hertan had a background in plastics materials or plastics recycling and that Hertan never told him "that he was a genius at plastics."

Fishbach had ample opportunity to question Hertan about the Plastics Recycling transactions and the nature and extent of Hertan's investigation, but the record in this case indicates that he did not do so.  He never asked Hertan if he had a background in plastics engineering or recycling.  Fishbach believed that Hertan had thoroughly reviewed the offering memoranda, and he testified that he understood from Hertan that PI "seemed to have a real foothold in the marketplace."  The offering memoranda, however, warned that there was no established market for the recyclers.  Fishbach testified that it was hard for him to say honestly that he "knew all of the tax benefits" associated with the Partnerships.  Yet the tax benefits flowing from SAB Recovery, SAB Recycling, and SAB Recovery Associates were reported on the Fishbachs' returns and attached Forms K-1, which Fishbach testified that he reviewed "in toto."  Fishbach testified that he did not review the financial projections set out in the offering memoranda; that he did not check the

prognosis for royalty distributions; and that he did not monitor his 1981 investment in SAB Recovery.  Apparently based upon an implicit understanding, Fishbach expected Hertan to do those things.  Yet it is not clear from the record in docket No. 19612-90 how thoroughly Hertan reviewed the offering memoranda and investigated the respective Partnership transactions. Notwithstanding his purported ignorance of the performance of his 1981 investment in SAB Recovery, and the tax benefits associated therewith, Fishbach invested in two more SAB Recycling Partnerships in 1982.

At the time Fishbach invested in the respective SAB Recycling Partnerships, he had been practicing law for nearly 20 years and was a named partner in a law firm with offices in Manhattan and Long Island.  Prior to 1981 he had invested in a number of ventures through the firm, including the financing and development of properties, construction of buildings, shopping centers throughout the country, and the construction of a television station.  With respect to the Partnership transactions, the essence of Fishbach's testimony is that he left everything to Hertan, including monitoring the investments. Fishbach did not pursue with Hertan any of the particulars of the Plastics Recycling transactions or Hertan's purported investigation of them.  In light of his education and professional and investment experience, we consider Fishbach's

claim of blind faith reliance on Hertan to be unconvincing.
Fishbach has not established that his purported reliance on
Hertan was reasonable, in good faith, or based upon full
disclosure.

###### d.  Steele, Cohen, and Porter

Fredericks contends that, in addition to relying on Becker,
he also relied on Steele, Cohen, and Porter.  Neither Steele,
Cohen, nor Porter testified at trial.

Steele was the accountant at Becker Co. primarily
responsible for handling the Fredericks' account.  With respect
to the Plastics Recycling transactions, Fredericks testified that
he spoke to Steele "about what effect [the investment would] have
on [the Fredericks'] estimated tax and things of that nature",
but he did not ask Steele "about the economics of the situation."
Steele never represented to Fredericks that he was an engineer or
expert in plastics recycling.  Other than the alleged explanation
of the impact the investment would have on the Fredericks' taxes,
there is nothing in the record suggesting the exact nature of the
advice, if any, that Fredericks received from Steele about the
Plastics Recycling transactions.

Cohen is an attorney whom Fredericks hired in October of
1981 to negotiate the settlement of an employment contract.
Fredericks asked Cohen whether he was familiar with the Plastics
Recycling transactions and whether he could review the SAB

Recycling offering memorandum from a legal standpoint.  He did not consider Cohen to be an engineer or an expert in plastics recycling.  Cohen indicated that he had invested in a 1981 Plastics Recycling transaction, and he agreed to compare the two offering memoranda.  Fredericks understood from Cohen that the two transactions were virtually the same and that the investment offered good tax advantages.  He did not ask Cohen whether he had received any royalties.

Porter was a licensed engineer and the president and principal stockholder of PDE, a plastics molding company for which Fredericks was a director.  Fredericks knew that PDE had been recycling plastic scrap since the late 1970's.  After reviewing the SAB Recycling offering memorandum, Fredericks telephoned Porter and asked him if there was any economic value in a machine that recycles polyethylene or one that recycles polystyrene.  According to Fredericks, Porter believed that recycling was economically viable depending upon the price of oil.  Fredericks did not inform or question Porter about the Plastics Recycling transactions, the Sentinel EPE recycler, or any details of plastics recycling.  He did not tell Porter what machine he was investing in; he did not describe the machine to Porter; he did not tell Porter the price of the machine; he did not send Porter a copy of the offering memorandum; and he did not ask Porter if there were any comparable machines already on the

market.  On cross-examination, Fredericks summed up his conversation with Porter as follows:

Q  So, basically, all you asked [Porter] was whether recycling was a--a feasible--a feasible thing, a feasible process.

A  As I testified, I asked him is a recycling machine a viable economic entity.

Q  Okay.  But you didn't go into the specifics of this machine.

A  I did not.

We hold that Fredericks' purported reliance on Steele, Cohen, and Porter was not reasonable, not in good faith, nor based on full disclosure.  Nothing in the record in docket No. 21847-90 suggests the nature of the advice, if any, Fredericks received from Steele, other than the monetary impact the investment would have on his taxes.  See Patin v. Commissioner, 88 T.C. at 1131.  Fredericks did not consider Cohen to be an engineer or an expert in plastics recycling.  Essentially, Cohen told Fredericks nothing more than that he had invested in a virtually identical tax-advantaged Plastics Recycling transaction a year before.  The two did not discuss anything of substance; Fredericks did not even ask Cohen if he had received any royalty distributions.  Fredericks' discussion with Porter was similarly bereft of substantive advice.  The only thing Fredericks asked

Porter was whether he believed a polyethylene or polystyrene recycler was economically viable. They did not discuss the Sentinel EPE recycler, the Plastics Recycling transactions, or plastics recycling in general. Fredericks will not be relieved of the negligence additions to tax based upon his purported reliance on Steele, Cohen, and Porter.

### 3. The Private Offering Memoranda

Petitioners in very general terms maintain that they reasonably relied upon the offering memoranda and the tax opinion letters appended thereto. However, petitioners' testimony and actions indicate that they did not give due consideration to all of the information set out in the offering memoranda and that they ultimately did not place a great deal of reliance, if any, on the representations therein.

The offering memoranda raised numerous caveats and warnings with respect to the Partnerships, including: (1) The substantial likelihood of audit by the IRS and a likely challenge of the purported value of the recyclers; (2) the general partner's lack of experience in marketing recycling or similar equipment; (3) the lack of an established market for the recyclers; and (4) uncertainties regarding the market prices for virgin resin and the possibility that recycled pellets would not be as marketable as virgin pellets. In addition, the offering memoranda noted a number of conflicts of interest, including Miller's interest in F

& G Corp. and his representation of Burstein, PI, and Grant, who was the sole shareholder of ECI Corp.  A careful consideration of the materials in the offering memoranda in these cases, especially the discussions of high writeoffs and risk of audit, should have alerted a prudent and reasonable investor to the questionable nature of the promised deductions and credits.  See Collins v. Commissioner, 857 F.2d 1383, 1386 (9th Cir. 1988), affg. Dister v. Commissioner, T.C. Memo. 1987-217; Sacks v. Commissioner, T.C. Memo. 1994-217.

In each of these consolidated cases the projected tax benefits in the respective offering memoranda exceeded petitioners' respective investments.  According to the offering memoranda, for each $50,000 investor, the projected first-year tax benefits were investment tax credits in excess of $82,600 plus deductions in excess of $40,000.  Specifically, the projected investment tax credits and deductions for the Partnerships in the first year of the investment for each $50,000 investor were as follows:

|                 | IT + BE Credits | Deductions |
|-----------------|-----------------|------------|
| SAB Recovery    | $82,639         | $40,003    |
| SAB Recycling   | 82,639          | 40,037     |
| SAB Reclamation | 83,712          | 40,234     |

As a result of Gollin's gross $12,500 investment in SAB Reclamation, he and his wife Harriet claimed an operating loss in the amount of $10,025 and investment tax and business energy

credits in the amount of $20,928.[10]  For Fredericks' gross $50,000 investment in SAB Recycling, he and his wife Stephanie claimed an operating loss in the amount of $39,741 and investment tax and business energy credits in the amount of $82,638 on their 1982 return.  As a result of Fishbach's one-third interest in ZFH, and ZFH's gross $50,000 investment in SAB Recovery in 1981 and gross $25,000 investment in SAB Recycling in 1982, on their 1982 return Fishbach and his wife Patricia claimed an operating loss in the amount of $7,230 and investment tax and business energy credits in the amount of $13,743.

The direct reductions in petitioners' Federal income tax, as a result of the investment tax credits alone, ranged from 165 percent to 167 percent of their cash investments, not taking into consideration any rebated commissions or advance royalty payments.[11]  Therefore, after adjustments of withholding, estimated tax, or final payment, like the taxpayers in Provizer v. Commissioner, T.C. Memo. 1992-177, "except for a few weeks at

---

[10]    The Gollins claimed $6,391 of the regular investment credit on their 1982 return and carried back the remainder, $4,073, to 1979 (an additional $896 in regular investment credits was claimed on their amended 1979 return).  With respect to the business energy credits, the Gollins carried back $6,919 to 1979 and $3,545 to 1980.

[11]    Although the record in docket No. 19612-90 does not disclose the amounts of Fishbach's second-tier interests, the projected investment tax and business energy credits for SAB Recovery and SAB Recycling for the first year of the investment, $82,639, is 165 percent of the corresponding projected investment amount, $50,000.

the beginning, petitioners [Gollin, Fishbach, and Fredericks] never had any money in the * * * [Partnership transactions]."  In view of the disproportionately large tax benefits claimed on petitioners' Federal income tax returns, relative to the dollar amounts invested, further investigation of the Partnership transactions clearly was required.  A reasonably prudent person would have asked a qualified independent tax adviser if this windfall were not too good to be true.  McCrary v. Commissioner, 92 T.C. at 850.  A reasonably prudent person would not conclude without substantial investigation that the Government was providing tax benefits so disproportionate to the taxpayers' investment of their own capital.

Petitioners' reliance upon the Court of Appeals for the Ninth Circuit's partial reversal of our decision in Osterhout v. Commissioner, T.C. Memo. 1993-251, affd. in part and revd. in part without published opinion sub nom. Balboa Energy Fund 1981 v. Commissioner, 85 F.3d 634 (9th Cir. 1996), is misplaced.  In Osterhout, we found that certain oil and gas partnerships were not engaged in a trade or business and sustained respondent's imposition of the negligence additions to tax with respect to one of the partners therein.[12]  The Court of Appeals for the Ninth

_____

[12]   Osterhout v. Commissioner, T.C. Memo. 1993-251, affd. in part and revd. in part without published opinion sub nom. Balboa Energy Fund 1981 v. Commissioner, 85 F.3d 634 (9th Cir. 1996), involved a group of consolidated cases.  The parties therein
(continued...)

Circuit reversed our imposition of the negligence additions to tax. Petitioners point out that the taxpayer in that case relied in part upon a tax opinion contained in the offering materials.

In the present cases, however, petitioners have not shown that they placed substantial reliance upon the tax opinion letter attached to the offering memoranda. Moreover, the offering memoranda for the Partnerships herein warned prospective investors that the accompanying tax opinion letters were not in final form, and were prepared for the general partner, and that prospective investors should consult their own professional advisers with respect to the tax benefits and tax risks associated with the Partnerships. The tax opinion letters accompanying the SAB Recovery, SAB Recycling, and SAB Reclamation offering memoranda were addressed solely to the general partner and began with the following opening disclaimer:

> This opinion is provided to you for your individual guidance. We expect that prospective investors will rely upon their own professional advisors with respect to all tax issues arising in connection with an investment in the Partnership and the operations thereof. We recognize that you intend to include this letter with your offering materials and we have consented to that with the understanding that the purpose in distributing it is to assist your offerees' and their tax advisors in making their own analysis and

---

[12](...continued)
agreed to be bound by the Court's opinion regarding the application of the additions to tax under sec. 6653(a), inter alia. Accordingly, although the Court's analysis focused on one taxpayer, the additions to tax were sustained with respect to all of the taxpayers.

> not to permit any prospective investor to rely upon our advice in this matter. [Emphasis added.]

Accordingly, the tax opinion letters expressly indicate that prospective investors such as petitioners were not to rely upon the tax opinion letter. See Collins v. Commissioner, 875 F.2d at 138. The limited, technical opinion of tax counsel expressed in these letters was not designed as advice upon which taxpayers might rely, and the opinion of counsel itself so states.

4. Miscellaneous

The parties in these consolidated cases stipulated that the fair market value of a Sentinel EPE recycler in 1981 and 1982 was not in excess of $50,000. Notwithstanding this concession, petitioners contend that they were reasonable in claiming credits on their Federal income tax returns based upon each recycler's having a value of $1,162,666. In support of this position, petitioners in docket Nos. 16922-90 and 19612-90 submitted into evidence preliminary reports prepared for respondent by Ernest D. Carmagnola (Carmagnola), the president of Professional Plastic Associates. Carmagnola had been retained by the IRS in 1984 to evaluate the Sentinel EPE and EPS recyclers in light of what he described as "the fantastic values placed on the [recyclers] by the owners." Based on limited information available to him at that time, Carmagnola preliminarily estimated that the value of the Sentinel EPE recycler was $250,000. However, after additional information became available to him, Carmagnola

concluded in a signed affidavit, dated March 16, 1993, that the machines actually had a fair market value of not more than $50,000 each in the Fall of 1981 and 1982.

We accord no weight to the Carmagnola reports submitted by petitioners. The projected valuations therein were based on inadequate information, research, and investigation, and were subsequently rejected and discredited by their author. In one preliminary report, Carmagnola states that he has "a serious concern of actual profit" of a Sentinel EPE recycler and that to determine whether the machines actually could be profitable, he required additional information from PI. Carmagnola also indicates that in preparing the report, he did not have information available concerning research and development costs of the machines and that he estimated those costs in his valuations of the machines.

Respondent rejected the Carmagnola reports and considered them unsatisfactory for any purpose, and there is no indication in the records that respondent used them as a basis for any determinations in the notices of deficiency. Even so, counsel for petitioners in docket Nos. 16922-90 and 19612-90 obtained copies of these reports and urge that they support the reasonableness of the values reported on the Gollins' and Fishbachs' returns. Not surprisingly, counsel in those cases did not call Carmagnola to testify, but preferred instead to rely

solely upon his preliminary, ill-founded valuation estimates. Carmagnola has not been called to testify in any of the Plastics Recycling cases before us. The Carmagnola reports were a part of the record considered by this Court and reviewed by the Sixth Circuit Court of Appeals in the Provizer case, where we held the taxpayers negligent. Consistent therewith, we find in these cases, as we have found previously, that the reports prepared by Carmagnola are unreliable and of no consequence. Petitioners Gollin and Fishbach are not relieved of the negligence additions to tax based on the preliminary reports prepared by Carmagnola.

Petitioners cite a number of cases in support of their positions, but primarily rely on Durrett v. Commissioner, 71 F.3d 515 (5th Cir. 1996), affg. in part and revg. in part T.C. Memo. 1994-179; Chamberlain v. Commissioner, 66 F.3d 729 (5th Cir. 1995), affg. in part and revg. in part T.C. Memo. 1994-228; Climenhage v. Commissioner, T.C. Memo. 1993-223; Reile v. Commissioner, T.C. Memo. 1992-488; Davis v. Commissioner, T.C. Memo. 1989-607; Chellappan v. Commissioner, T.C. Memo. 1988-208; Mollen v. United States, 72 AFTR 2d 93-6443, 93-2 USTC par. 50,585 (D. Ariz. 1993).

This Court declined to sustain the negligence additions to tax in the Reile and Davis cases for reasons inapposite to the facts herein. In the Davis case, the taxpayers reasonably relied upon a "trusted and long-term adviser" who was independent of the

investment venture, and the offering materials reviewed by the taxpayers did not reflect that the principals in the venture lacked experience in the pertinent line of business.  In the Reile case, the taxpayers, a married couple, had only one year of college between them and characterized themselves as financial "dummies."  In contrast to those cases, petitioners herein are well educated and experienced professionals.  Becker and Steele were not independent of the SAB Recycling Partnerships and Becker disclosed the limitations of his investigation.  Cohen was not a long-term adviser to Fredericks, and there is no evidence that he had any expertise with respect to the Plastics Recycling transaction.  Porter did not advise Fredericks specifically with respect to the Sentinel EPE recycler or the Plastics Recycling transactions.  In addition, the offering memoranda warned that the Partnerships had no prior operating history and that the general partner had no prior experience in marketing recycling or similar equipment.  Accordingly, petitioners' reliance on the Reile and Davis cases is misplaced.

In Mollen v. United States, supra, the taxpayer was a medical doctor who specialized in diabetes and who, on behalf of the Arizona Medical Association, led a continuing medical education (CME) accreditation program for local hospitals.  The underlying tax matter involved the taxpayer's investment in Diabetics CME Group, Ltd., a limited partnership that invested in

the production, marketing, and distribution of medical educational video tapes. The District Court found that the taxpayer's personal expertise and insight in the underlying investment gave him reason to believe it would be economically profitable. Although the taxpayer was not experienced in business or tax matters, he did consult with an accountant and a tax lawyer regarding those matters. Moreover, the District Court noted that the propriety of the taxpayer's disallowed deduction therein was "reasonably debatable." Id. at 93-6447, 93-2 USTC par. 50,585, at 89,895; see Zfass v. Commissioner, T.C. Memo. 1996-167.

Neither petitioners nor Becker had any formal education, expertise, or experience in plastics recycling. Neither Cohen, Steele, nor Hertan ever represented that he was expert in plastics recycling and Fredericks and Fishbach had no reason to believe otherwise. The records indicate that none of petitioners or their purported advisers had any personal insight or industry know-how in plastics recycling that would reasonably lead them to believe that the Plastics Recycling transactions would be economically profitable. Although Fredericks served on the board of a plastics molding company, there is no showing in docket No. 21847-90 that this gave him special insight into plastics recycling. Moreover, when he purportedly spoke to Porter about a polyethylene or polystyrene recycler, he sought no advice

specifically about the Plastics Recycling transactions or the Sentinel EPE recycler. Similarly, Becker purportedly discussed the transactions with Canno, who apparently was familiar with the plastics industry, but Canno was not hired by Becker to investigate PI and the Sentinel EPE recycler, never saw a Sentinel EPE recycler, and never prepared any kind of formal, written analysis of the venture. Becker and petitioners relied upon representations by insiders to the Plastics Recycling transactions, and neither he nor petitioners hired any independent experts in the field of plastic materials or plastics recycling. Accordingly, we consider petitioners' arguments with respect to the Mollen case inapplicable under the circumstances of these cases.

In Climenhage, the taxpayers incorrectly excluded from gross income damages awarded to them in a breach of contract suit. We rejected imposition of the negligence addition to tax because the taxpayers reasonably followed the tax advice of the attorney who brought their suit. Unlike petitioners' cases, the adviser in the Climenhage case was aware of all of the relevant facts and his advice pertained to a matter within his area of expertise, interpretation of the law. Accordingly, petitioners' reliance on Climenhage v. Commissioner, supra, is misplaced.

In Chellappan v. Commissioner, supra, the taxpayers invested in a fraudulent equipment leasing tax shelter. Although the

subject machines--modified copiers--performed adequately on a demonstration basis, prolonged use was mechanically impracticable. Under "the somewhat unique circumstances of [that] case," we found no basis for the negligence addition to tax. The taxpayers had seen the equipment demonstrated and had no reason to suspect that the scheme was fraudulent. They and their accountant/adviser were in general aware of the cost of ordinary office copy machine equipment, and the modified machines were not priced disproportionately higher than first class copy machine equipment. At the behest of one of the taxpayers, a securities broker contacted an IRS representative and was told that he saw no problem with the investment. Also, a revenue agent told the accountant that the venture sounded good and that he might be interested in investing himself; and at least some of the taxpayers were told that the IRS had looked at the shelter and found it legitimate. In addition, the accountant or his son told the taxpayers that the machine was unique and had been patented.

In contrast, the Sentinel EPE recycler was priced disproportionately higher than other plastics recycling machines on the market, a fact that should not have eluded a serious investigation by petitioners or their purported advisers.[13] None

---

[13] The Fredericks stipulated that information published prior to the Plastics Recycling transactions indicated that several machines capable of densifying low density materials were already on the market.

of petitioners saw a Sentinel EPE recycler prior to investing in the Partnerships.  Not only were petitioners not under the impression that the IRS had informally approved of the Plastics Recycling transactions, but the offering memoranda expressly warned of a substantial likelihood of audit and that the purchase price of the recyclers would probably be challenged by the IRS as being in excess of fair market value.  In addition, even though PI had obtained patents prior to the Plastics Recycling transactions, PI actually claimed that it had never obtained patents on any of its machines.  The facts of petitioners' cases are distinctly different from those in Chellappan v. Commissioner, T.C. Memo. 1988-208, and we consider it inapplicable under the circumstances of petitioners' cases.

Petitioners also rely on two recent decisions by the Court of Appeals for the Fifth Circuit that reversed this Court's imposition of the negligence additions to tax in a pair of non-plastics recycling cases:  Durrett v. Commissioner, 71 F.3d 515 (5th Cir. 1996); and Chamberlain v. Commissioner, 66 F.3d 729 (5th Cir. 1995).  The taxpayers in the Durrett and Chamberlain cases were among thousands who invested in the First Western tax shelter program involving alleged straddle transactions of forward contracts.  In the Durrett and Chamberlain cases, the Court of Appeals for the Fifth Circuit concluded that the taxpayers reasonably relied upon professional advice concerning tax matters.  In other First Western cases, however, the Courts

of Appeals have affirmed decisions of the Tax Court imposing negligence additions to tax.  See <u>Chakales v. Commissioner</u>, T.C. Memo. 1994-408 (reliance on long-term adviser, who was a tax attorney and accountant, and who in turn relied on a promoter of the venture, held unreasonable), affd. 79 F.3d 726 (8th Cir. 1996); <u>Kozlowski v. Commissioner</u>, T.C. Memo. 1993-430 (reliance on adviser held unreasonable absent a showing that the adviser understood the transaction and was qualified to give an opinion whether it was bona fide), affd. without published opinion 70 F.3d 1279 (9th Cir. 1995); <u>Freytag v. Commissioner</u>, 89 T.C. 849 (1987) (reliance on tax advice given by attorneys and C.P.A.'s held unreasonable absent a showing that the taxpayers consulted any experts regarding the bona fides of the transactions), affd. 904 F.2d 1011 (5th Cir. 1990), affd. 501 U.S. 868 (1991).  Here we have found that none of the advisers consulted by petitioners possessed sufficient knowledge of the plastics recycling business to render a competent opinion.[14]  This circumstance has been deemed relevant by the Court of Appeals for the Second Circuit, the court to which appeal in these cases lies.  See <u>David v. Commissioner</u>, 43 F.3d at 789-790  (taxpayers' reliance on expert

---

[14]   Fredericks purports to have spoken to Porter, a licensed engineer and the president of a plastics molding company that at the time was recycling plastic.  However, Porter did not testify at trial, and Fredericks did not establish the extent of Porter's expertise in plastics recycling, if any.  Moreover, when Fredericks spoke with Porter by telephone they did not discuss the Plastics Recycling transactions or the Sentinel EPE recyclers.

advice not reasonable where expert lacks knowledge of business in which taxpayers invested); Goldman v. Commissioner, 39 F.3d at 408 (same). Accordingly, we shall not relieve petitioners of the negligence additions to tax based upon the Court of Appeals for the Fifth Circuit's decisions in the Durrett and Chamberlain cases.[15]

### 5. Conclusion as to Negligence

Under the circumstances of these cases, petitioners failed to exercise due care in claiming large deductions and tax credits with respect to the Partnerships on their Federal income tax returns. We hold that petitioners did not reasonably rely upon the offering memoranda, their purported advisers, or in good faith investigate the underlying viability, financial structure, and economics of the Partnership transactions. We are unconvinced by the claim of these experienced and highly sophisticated, able, and successful professionals that they reasonably failed to inquire about their investments and simply relied on the offering circulars and their purported advisers, despite warnings in the offering circulars and explanations by Becker about the limitations of his investigation. In each case

---

[15] Other cases cited by petitioners are inapplicable and distinguishable for the following general, nonexclusive reasons: (1) They involve far less sophisticated, if not unsophisticated, taxpayers; (2) the reasonableness of the respective taxpayers' reliance on expert advice was established in those cases on grounds that do not exist here; and (3) the advice given was within the adviser's area of expertise.

these taxpayers knew or should have known better.  We hold, upon consideration of the entire records, that petitioners are liable for the negligence additions to tax under the provisions of section 6653(a) for the taxable years at issue.  Respondent is sustained on this issue.

B.  Section 6659--Valuation Overstatement

In notices of deficiency, respondent determined that petitioners Gollin and Fredericks were liable for the section 6659 addition to tax on the portion of their respective underpayments attributable to valuation overstatement.  In a stipulation of settled issues, the Fredericks conceded the section 6659 addition to tax on the portion of their underpayment attributable to the disallowance of the investment tax and business energy credits claimed as a result of their participation in the Plastics Recycling Program.  Petitioners Gollin have the burden of proving that respondent's determination of the section 6659 addition to tax in their case is erroneous. Rule 142(a); Luman v. Commissioner, 79 T.C. at 860-861.

In an amendment to answer, respondent asserted that petitioners Fishbach were liable for the section 6659 addition to tax on the portion of their underpayment attributable to valuation overstatement.  Because the section 6659 addition to tax was raised for the first time in the amendment to answer, the burden of proof is shifted to respondent.  Rule 142(a); Vecchio v. Commissioner, 103 T.C. 170, 196 (1994).  For convenience, in

this subsection hereafter references to "petitioners" shall be limited to petitioners Gollin and Fishbach.

A graduated addition to tax is imposed when an individual has an underpayment of tax that equals or exceeds $1,000 and "is attributable to" a valuation overstatement. Sec. 6659(a), (d). A valuation overstatement exists if the fair market value (or adjusted basis) of property claimed on a return equals or exceeds 150 percent of the amount determined to be the correct amount. Sec. 6659(c). If the claimed valuation exceeds 250 percent of the correct value, the addition is equal to 30 percent of the underpayment. Sec. 6659(b).

Petitioners claimed tax benefits, including an investment tax credit and a business energy credit, based on purported values of $1,162,666 for each Sentinel EPE recycler. Petitioners concede that the fair market value of a Sentinel EPE recycler in 1981 and 1982 was not in excess of $50,000. Therefore, if disallowance of petitioners' claimed tax benefits is attributable to such valuation overstatements, petitioners are liable for the section 6659 additions to tax at the rate of 30 percent of the underpayment of tax attributable to the tax benefits claimed with respect to the Partnerships.

Petitioners contend that section 6659 does not apply in their cases for the following three reasons: (1) Disallowance of the claimed tax benefits was attributable to other than a valuation overstatement; (2) petitioners' concessions of the

claimed tax benefits precludes imposition of the section 6659 additions to tax; and (3) respondent erroneously failed to waive the section 6659 addition to tax.  We reject each of these arguments for reasons set forth below.

 1.  The Grounds for Petitioners' Underpayments

Section 6659 does not apply to underpayments of tax that are not "attributable to" valuation overstatements.  See McCrary v. Commissioner, 92 T.C. 827 (1989); Todd v. Commissioner, 89 T.C. 912 (1987), affd. 862 F.2d 540 (5th Cir. 1988).  To the extent taxpayers claim tax benefits that are disallowed on grounds separate and independent from alleged valuation overstatements, the resulting underpayments of tax are not regarded as attributable to valuation overstatements.  Krause v. Commissioner, 99 T.C. 132, 178 (1992) (citing Todd v. Commissioner, supra), affd. sub nom. Hildebrand v. Commissioner, 28 F.3d 1024 (10th Cir. 1994).  However, when valuation is an integral factor in disallowing deductions and credits, section 6659 is applicable.  See Illes v. Commissioner, 982 F.2d 163, 167 (6th Cir. 1992), affg. T.C. Memo. 1991-449; Gilman v. Commissioner, 933 F.2d 143, 151 (2d Cir. 1991) (section 6659 addition to tax applies if a finding of lack of economic substance is "due in part" to a valuation overstatement), affg. T.C. Memo. 1989-684; Masters v. Commissioner, T.C. Memo. 1994-197, affd. without published opinion 70 F.3d 1262 (4th Cir. 1995); Harness v. Commissioner, T.C. Memo. 1991-321.

Petitioners argue that the disallowance of the claimed tax benefits was not "attributable to" a valuation overstatement. According to petitioners, the tax benefits were disallowed because the Partnership transactions lacked economic substance, not because of any valuation overstatements. It follows, petitioners reason, that because the "attributable to" language of section 6659 requires a direct causative relationship between a valuation overstatement and an underpayment in tax, section 6659 cannot apply to their deficiencies. Petitioners cite the following cases to support this argument: Heasley v. Commissioner, 902 F.2d 380 (5th Cir. 1990), revg. T.C. Memo. 1988-408; Gainer v. Commissioner, 893 F.2d 225 (9th Cir. 1990), affg. T.C. Memo. 1988-416; McCrary v. Commissioner, supra; Todd v. Commissioner, supra.

Petitioners' argument rests on the mistaken premise that our holding herein that the Partnership transactions lacked economic substance was separate and independent from the overvaluation of the Sentinel EPE recyclers. To the contrary, in holding that the Partnership transactions lacked economic substance, we relied heavily upon the overvaluation of the recyclers. Overvaluation of the recyclers was an integral factor in regard to: (1) The disallowed tax credits and other benefits in these cases; (2) the underpayments of tax; and (3) our finding that the Partnership transactions lacked economic substance.

Petitioners argue that in <u>Provizer v. Commissioner</u>, T.C. Memo. 1992-177, we found that the Clearwater transaction lacked economic substance for reasons independent of the valuation reported in that case. According to petitioners, the purported value of the recyclers in the Clearwater transaction was predicated upon a projected stream of royalty income, and this Court merely rejected the taxpayer's valuation method. Petitioners misread and distort our <u>Provizer</u> opinion. In the <u>Provizer</u> case, overvaluation of the Sentinel EPE recyclers, irrespective of the technique employed by the taxpayers in their efforts to justify the overvaluation, was the dominant factor that led us to hold that the Clearwater transaction lacked economic substance. Likewise, overvaluation of the Sentinel EPE recyclers in these cases is the ground for our holding herein that the Partnership transactions lacked economic substance.

Moreover, a virtually identical argument was recently rejected in <u>Gilman v. Commissioner</u>, <u>supra</u>, by the Court of Appeals for the Second Circuit, the court to which appeal in these cases lie. See <u>Golsen v. Commissioner</u>, 54 T.C. 742, 756-758 (1970), affd. 445 F.2d 985 (10th Cir. 1971). In the <u>Gilman</u> case, the taxpayers engaged in a computer equipment sale and leaseback transaction that this Court held was a sham transaction lacking economic substance. The taxpayers therein, citing <u>Todd v. Commissioner</u>, <u>supra</u>, and <u>Heasley v. Commissioner</u>, <u>supra</u>,

argued that their underpayment of taxes derived from
nonrecognition of the transaction for lack of economic substance,
independent of any overvaluation.  The Court of Appeals for the
Second Circuit sustained imposition of the section 6659 addition
to tax because overvaluation of the computer equipment
contributed directly to this Court's earlier conclusion that the
transaction lacked economic substance and was a sham.  Gilman v.
Commissioner, supra at 151.  In addition, the Court of Appeals
for the Second Circuit agreed with this Court and with the Court
of Appeals for the Eighth Circuit that "'when an underpayment
stems from disallowed * * * investment credits due to lack of
economic substance, the deficiency is * * * subject to the
penalty under section 6659.'"  Id. at 151 (quoting Massengill v.
Commissioner, 876 F.2d 616, 619-620 (8th Cir. 1989), affg. T.C.
Memo. 1988-427); see also Rybak v. Commissioner, 91 T.C. 524,
566-567 (1988); Zirker v. Commissioner, 87 T.C. 970, 978-979
(1986); Donahue v. Commissioner, T.C. Memo. 1991-181, affd.
without published opinion 959 F.2d 234 (6th Cir. 1992), affd. sub
nom. Pasternak v. Commissioner, 990 F.2d 893 (6th Cir. 1993).

Petitioners' reliance on Gainer v. Commissioner, 893 F.2d
225 (9th Cir. 1990); Todd v. Commissioner, 862 F.2d 540 (5th Cir.
1988); and McCrary v. Commissioner, 92 T.C. 827 (1989), is
misplaced.  In those cases, in contrast to the consolidated cases
herein, it was found that a valuation overstatement did not

contribute to an underpayment of taxes. In the Todd and Gainer cases, the underpayments were due exclusively to the fact that the property in each case had not been placed in service. In the McCrary case, the underpayments were deemed to result from a concession that the agreement at issue was a license and not a lease. Although property was overvalued in each of those cases, the overvaluations were not the ground on which the taxpayers' liability was sustained. In contrast, "a different situation exists where a valuation overstatement * * * is an integral part of or is inseparable from the ground found for disallowance of an item." McCrary v. Commissioner, supra at 859. The cases of petitioners Fishbach and Gollin present just such a "different situation": overvaluation of the recyclers was integral to and inseparable from petitioners' claimed tax benefits and our holding that the Partnership transactions lacked economic substance.[16]

---

[16] To the extent that Heasley v. Commissioner, 902 F.2d 380 (5th Cir. 1990), revg. T.C. Memo. 1988-408, merely represents an application of Todd v. Commissioner, 89 T.C. 912 (1987), affd. 862 F.2d 540 (5th Cir. 1988), we consider it distinguishable. To the extent that the reversal in the Heasley case is based on a concept that where an underpayment derives from the disallowance of a transaction for lack of economic substance, the underpayment cannot be attributable to an overvaluation, this Court and the Court of Appeals for the Second Circuit have disagreed. See Gilman v. Commissioner, 933 F.2d 143, 151 (2d Cir. 1991) ("The lack of economic substance was due in part to the overvaluation, and thus the underpayment was attributable to the valuation overstatement.")

## 2. Concession of the Deficiency

Petitioners argue that their concessions of the deficiencies preclude imposition of the section 6659 additions to tax. Petitioners contend that their concessions render any inquiry into the grounds for such deficiencies moot. Absent such inquiry, petitioners argue that it cannot be known if their underpayments were attributable to a valuation overstatement or other discrepancy. Without a finding that a valuation overstatement contributed to an underpayment, according to petitioners, section 6659 cannot apply. In support of this line of reasoning, petitioners rely heavily upon Heasley v. Commissioner, supra, and McCrary v. Commissioner, supra.

Petitioners' open-ended concessions do not obviate our finding that the Partnership transactions lacked economic substance due to overvaluation of the recyclers. This is not a situation where we have "to decide difficult valuation questions for no reason other than the application of penalties." See McCrary v. Commissioner, supra at 854 n.14. The value of the Sentinel EPE recycler was established in Provizer v. Commissioner, T.C. Memo. 1992-177, and stipulated by the parties. As a consequence of the inflated value assigned to the recyclers by the Partnerships, petitioners claimed deductions and credits that resulted in underpayments of tax, and we held that the Partnership transactions lacked economic substance. Regardless of petitioners' concessions, in these cases the underpayments of

tax were attributable to the valuation overstatements.

Moreover, concession of the investment tax credit in and of itself does not relieve taxpayers of liability for the section 6659 addition to tax. See Dybsand v. Commissioner, T.C. Memo. 1994-56; Chiechi v. Commissioner, T.C. Memo. 1993-630. Instead, the ground upon which the investment tax credit is disallowed or conceded is significant. Dybsand v. Commissioner, supra. Even in situations in which there are arguably two grounds to support a deficiency and one supports a section 6659 addition to tax and the other does not, the taxpayer may still be liable for the addition to tax. Gainer v. Commissioner, 893 F.2d at 228; Irom v. Commissioner, 866 F.2d 545, 547 (2d Cir. 1989), vacating in part T.C. Memo. 1988-211; Harness v. Commissioner, T.C. Memo. 1991-321.

In the present cases, no argument was made and no evidence was presented to the Court to prove that disallowance and concession of the claimed investment tax credits and other tax benefits related to anything other than a valuation overstatement. To the contrary, petitioners each stipulated substantially the same facts concerning the Partnership transactions as we found in Provizer v. Commissioner, supra. In the Provizer case, we held that the taxpayers were liable for the section 6659 addition to tax because the underpayment of taxes was directly related to the overvaluation of the Sentinel EPE recyclers. The overvaluation of the recyclers, exceeding 2325

percent, was an integral part of our findings in Provizer v. Commissioner, supra, that the transaction was a sham and lacked economic substance.  Similarly, the records in these cases plainly show that the overvaluation of the recyclers is integral to and is the core of our holding that the underlying transactions here were shams and lacked economic substance.

Petitioners' reliance on McCrary v. Commissioner, supra, is misplaced.  In that case, the taxpayers conceded their claimed tax benefits, and the section 6659 additions to tax were held inapplicable.  However, the concessions of the claimed tax benefits, in and of themselves, did not preclude imposition of the section 6659 additions to tax.  In McCrary v. Commissioner, supra, the section 6659 addition to tax was disallowed because the agreement at issue was conceded to be a license and not a lease.  In contrast, the records in petitioners' cases plainly show that petitioners' underpayments were attributable to overvaluation of the Sentinel EPE recyclers.  We hold that petitioners' reliance on McCrary v. Commissioner, supra, is inappropriate.[17]

We held in Provizer v. Commissioner, supra, that each

---

[17]  Petitioners' citation of Heasley v. Commissioner, supra, in support of the concession argument is also inappropriate.  That case was not decided by the Court of Appeals for the Fifth Circuit on the basis of a concession.  Moreover, see supra note 16 to the effect that the Court of Appeals for the Second Circuit and this Court have not followed the Heasley opinion with respect to the application of sec. 6659.

Sentinel EPE recycler had a fair market value not in excess of $50,000. Our finding in the Provizer case that the Sentinel EPE recyclers had been overvalued was integral to and inseparable from our holding of a lack of economic substance. Petitioners stipulated that the Partnership transactions were similar to the Clearwater transaction described in the Provizer case, and that the fair market value of a Sentinel EPE recycler in 1981 and 1982 was not in excess of $50,000. Given those concessions, and the fact that the records here plainly show that the overvaluations of the recyclers was the only reason for the disallowance of the claimed tax benefits, we conclude that the deficiencies were attributable to overvaluation of the Sentinel EPE recyclers.

### 3. Section 6659(e)

Petitioners argue that respondent erroneously failed to waive the section 6659 additions to tax. Section 6659(e) authorizes respondent to waive all or part of the addition to tax for valuation overstatements if taxpayers establish that there was a reasonable basis for the adjusted bases or valuations claimed on the returns and that such claims were made in good faith. Respondent's refusal to waive a section 6659 addition to tax is reviewable by this Court for abuse of discretion. Krause v. Commissioner, 99 T.C. at 179. Abuse of discretion has been found in situations where respondent's refusal to exercise her discretion is arbitrary, capricious, or unreasonable. See Mailman v. Commissioner, 91 T.C. 1079 (1988); Estate of Gardner

v. Commissioner, 82 T.C. 989 (1984); Haught v. Commissioner, T.C. Memo. 1993-58.

We note initially that petitioners did not request respondent to waive the section 6659 additions to tax until well after the trials of these cases. The Gollins made their request more than 6 months after the trial of their case, and the Fishbachs made their request more than 4 months after the trial of their case. We are reluctant to find that respondent abused her discretion in these cases when she was not timely requested to exercise it and there is no direct evidence of any abuse of administrative discretion. Haught v. Commissioner, supra; cf. Wynn v. Commissioner, T.C. Memo. 1995-609; Klieger v. Commissioner, T.C. Memo. 1992-734.

However, we do not decide this issue solely on petitioners' failure timely to request waivers, but instead, we have considered the issue on its merits. Petitioners urge that they relied on the respective offering materials and Becker in deciding on the valuation claimed on their tax returns. Fishbach maintains that he relied on Hertan as well. Petitioners contend that such reliance was reasonable, and, therefore, that respondent should have waived the section 6659 additions to tax.[18] However, as we explained above in finding petitioners

---

[18] In their posttrial brief, the Gollins referenced the reports prepared by Carmagnola in support of the reasonableness of the claimed valuation. For reasons discussed supra, we consider the
(continued...)

liable for the negligence additions to tax, petitioners' purported reliance on the offering materials and their advisers was not reasonable.

The offering materials for the Partnerships contained numerous warnings and caveats, including the likelihood that the value placed on the recyclers would be challenged by the IRS as being in excess of fair market value. At trial, Fishbach was unsure if he had read the offering memoranda and speculated that he spent just a short amount of time perusing them and that he flipped through the risk factors. Neither Fishbach nor Gollin sought to resolve the numerous issues raised in the offering memoranda.

Becker possessed no special qualifications or professional skills in the recycling or plastics industries and petitioners had no reason to believe otherwise. Although Fishbach claims that he did not know whether Hertan had any education or experience in plastics recycling, nothing in Hertan's background would indicate such qualifications, and Fishbach conceded that Hertan never said he had such education or experience. Despite these obvious limitations, Becker, Hertan, and petitioners never hired or consulted any plastics engineering or technical experts with respect to the Plastics Recycling transactions. Becker

---

[18](...continued)
reports prepared by Carmagnola to be unreliable and of no consequence.

spoke with Canno, who apparently had some knowledge of the plastics industry, but the substance of Canno's purported comments is doubtful, and he had only minimal information about the transaction. At trial, Becker confirmed that in the end he relied exclusively on PI, its personnel, and the offering materials as to the value and purported uniqueness of the machines. Hertan similarly relied on PI personnel and the offering materials, in addition to Becker.

In support of their contention that they acted reasonably, petitioners cite Mauerman v. Commissioner, 22 F.3d 1001 (10th Cir. 1994), revg. T.C. Memo. 1993-23. However, the facts in the Mauerman case are distinctly different from the facts of these cases. In Mauerman, the Court of Appeals for the Tenth Circuit held that the Commissioner had abused her discretion for not waiving a section 6661 addition to tax. Like section 6659, a section 6661 addition to tax may be waived by the Commissioner if the taxpayer demonstrates that there was reasonable cause for his underpayment and that he acted in good faith. Sec. 6661(c). The taxpayer in Mauerman relied upon independent attorneys and accountants for advice as to whether payments were properly deductible or capitalized. The advice relied upon by the taxpayer in Mauerman was within the scope of the advisers' expertise, the interpretation of the tax laws as applied to undisputed facts. In these cases, particularly with respect to valuation, petitioners relied upon advice that was outside the

scope of expertise and experience of their advisers. Consequently, we consider petitioners' reliance on the Mauerman case inappropriate.

We hold that petitioners did not have a reasonable basis for the adjusted bases or valuations claimed on their tax returns with respect to their investments in the Partnerships. In these cases, respondent could find that petitioners' respective reliance on the offering materials, Becker, and Hertan was unreasonable. The records in these cases do not establish an abuse of discretion on the part of respondent but support respondent's position. We hold that respondent's refusal to waive the section 6659 addition to tax is not an abuse of discretion. Petitioners are liable for the respective section 6659 additions to tax at the rate of 30 percent of the underpayments of tax attributable to the disallowed tax benefits. Respondent is sustained on this issue.

C. Petitioners' Motions For Leave To File Motion For Decision Ordering Relief From the Negligence Penalty and the Penalty Rate of Interest and To File Supporting Memorandum of Law

Long after the trials of these cases, petitioners Gollin and Fishbach each filed a Motion For Leave To File Motion For Decision Ordering Relief From the Negligence Penalty and the Penalty Rate of Interest and To File Supporting Memorandum of Law under Rule 50. Petitioners Gollin and Fishbach also lodged with the Court motions for decision ordering relief from the additions to tax for negligence and from the increased rate of interest,

with attachments, and memoranda in support of such motions. Respondent filed objections, with attachments, and memoranda in support thereof, and petitioners thereafter filed reply memoranda. Petitioners Gollin and Fishbach argue that they should be afforded the same settlement that was reached between other taxpayers and the IRS in docket Nos. 10382-86 and 10383-86, each of which was styled Miller v. Commissioner. See Farrell v. Commissioner, T.C. Memo. 1996-295 (denying a motion similar to petitioners' motions); see also Grelsamer v. Commissioner, T.C. Memo. 1996-399 and Zenkel v. Commissioner, T.C. Memo. 1996-398. For convenience, in this subsection hereafter references to "petitioners" shall be limited to petitioners Gollin and Fishbach.

Counsel for petitioners seek to raise a new issue long after the trials in these cases. Resolution of such issue might well require new trials. Such further trials "would be contrary to the established policy of this Court to try all issues raised in a case in one proceeding and to avoid piecemeal and protracted litigation." Markwardt v. Commissioner, 64 T.C. 989, 998 (1975); see also Robin Haft Trust v. Commissioner, 62 T.C. 145, 147 (1974). Consequently, under the circumstances here, at this late date in the litigation proceedings, long after trial and briefing and after the issuance of numerous opinions on issues and facts closely analogous to those in these cases, petitioners' motions for leave are not well founded. Farrell v. Commissioner, supra.

Even if petitioners' motions for leave were granted, the arguments set forth in each of petitioners' motions for decision and attached memoranda, lodged with this Court, are invalid and such motions would be denied.  Therefore, and for reasons set forth in more detail below, petitioners' motions for leave shall be denied.

Some of our discussion of background and circumstances underlying petitioners' motions is drawn from documents submitted by the parties and findings of this Court in two earlier decisions.  See Estate of Satin v. Commissioner, T.C. Memo. 1994-435; Fisher v. Commissioner, T.C. Memo. 1994-434.  Such matters are not disputed by the parties.  We discuss the background matters for the sake of completeness.  As we have noted, granting petitioners' motions for leave would require further proceedings.

The Estate of Satin and Fisher cases involved Stipulation of Settlement agreements (piggyback agreements) made available to taxpayers in the Plastics Recycling project, whereby taxpayers could agree to be bound by the results of three test cases: Provizer v. Commissioner, T.C. Memo. 1992-177, and the two Miller cases.  We held in the Estate of Satin and Fisher cases that the terms of the piggyback agreement bound the parties to the results in all three lead cases, not just the Provizer case.  Petitioners assert that the piggyback agreement was extended to them, but they do not claim to have accepted the offer timely, so they

effectively rejected it.[19]

In or about February of 1988, a settlement offer (the Plastics Recycling project settlement offer or the offer) was made available by respondent in all docketed Plastics Recycling cases, and subsequently in all nondocketed cases. <u>Baratelli v. Commissioner</u>, T.C. Memo. 1994-484. Pursuant to the offer, taxpayers had 30 days to accept the following terms: (1) Allowance of a deduction for 50 percent of the amount of the cash investment in the venture in the year(s) of investment to the extent of loss claimed; (2) Government concession of the substantial understatement of tax penalties under section 6661 and the negligence additions to tax under section 6653(a)(1) and (2); (3) taxpayer concession of the section 6659 addition to tax for valuation overstatement and the increased rate of interest under section 6621; and (4) execution of a closing agreement (Form 906) stating the settlement and resolving the entire matter for all years.[20] Petitioners assert that the Plastics Recycling project settlement offer was extended to them, but they do not

---

[19] In each of their motions for decision, petitioners state, "After the lead counsel for taxpayers and Respondent had agreed upon the designation of the lead cases, <u>Respondent's counsel prepared piggyback agreements and offered them to counsel for the taxpayers in this case</u> and to other taxpayers." (Emphasis added.)

[20] Although the records do not include a settlement offer to petitioners, petitioners have attached to their motions for decision a copy of a settlement offer to another taxpayer with respect to a plastics recycling case, and respondent has not disputed the accuracy of the statement of the plastics recycling settlement offer.

claim to have accepted the offer timely, so they effectively rejected it.[21]

In December 1988, the Miller cases were disposed of by settlement agreement between the taxpayers and respondent.[22] This Court entered decisions based upon those settlements on December 22, 1988. The settlement provided that the taxpayers in the Miller cases were liable for the addition to tax under section 6659 for valuation overstatement, but not for the additions to tax under the provisions of section 6661 and section 6653(a). The increased interest under section 6621(c), premised

---

[21] In each of their motions for decision, petitioners state: "Respondent formulated a standard settlement position which was extended to all taxpayers having docketed or non-docketed cases in the plastics recycling group, including Petitioner." (Emphasis added.)

In docket No. 16922-90, respondent attached to her objection to petitioners' motion for leave a copy of an Appeals Transmittal Memorandum and Supporting Statement, dated Apr. 26, 1990, which relates that the Gollins were offered and rejected the offer. The Gollins have not disputed the accuracy of its contents.

In docket No. 19612-90, respondent attached to her objection to petitioners' motion for leave a copy of a letter, dated Apr. 19, 1988, extending the offer to petitioners Fishbach in another plastics recycling case, docket No. 34890-87. Also attached to respondent's objection is a copy of the Fishbachs' reply letter, which rejected the offer but stated their desire to stipulate to be bound to the test cases. Respondent states in her objection that docket No. 34890-87 is among the cases in which she made administrative abatements of the negligence additions to tax and increased interest. See Farrell v. Commissioner, T.C. Memo. 1996-295. The Fishbachs have not disputed the accuracy of the copies of the settlement offer in docket No. 34890-87, their reply letter, or respondent's subsequent abatements in that case.

[22] Although it is not otherwise a part of the record in the Gollin and Fishbach cases, respondent attached copies of the Miller closing agreement and disclosure waiver to her objections to petitioners' motion for leave, and petitioners do not dispute the accuracy of the document.

solely upon Miller's interest in the recyclers for the taxable years at issue, was not applicable because Miller made payments prior to December 31, 1984, so no interest accrued after that time. Respondent did not notify petitioners or any other taxpayers of the disposition of the Miller cases. Estate of Satin v. Commissioner, supra; Fisher v. Commissioner, supra.

Petitioners argue that they are similarly situated to the taxpayer in the Miller cases, and that in accordance with the principle of "equality" they are therefore entitled to the same settlement agreement executed by respondent and Miller in those cases. In effect, petitioners seek to resurrect the piggyback agreement offer and/or the settlement offer they previously failed to accept.

Petitioners contend that under the principle of equality, the Commissioner has a duty of consistency toward similarly situated taxpayers and cannot tax one and not tax another without some rational basis for the difference. United States v. Kaiser, 363 U.S. 299, 308 (1960) (Frankfurter, J., concurring); see Baker v. United States, 748 F.2d 1465 (11th Cir. 1984), affg. 575 F. Supp. 508 (N.D. Ga. 1983); Farmers' & Merchants' Bank v. United States, 476 F.2d 406 (4th Cir. 1973). According to petitioners, the principle of equality precludes the Commissioner from making arbitrary distinctions between like cases. See Baker v.

Commissioner, 787 F.2d 637, 643 (D.C. Cir. 1986), vacating 83 T.C. 822 (1984).

The different tax treatment accorded petitioners and Miller was not arbitrary or irrational. While petitioners and Miller both invested in the Plastics Recycling project, their actions with respect to such investments provide a rational basis for treating them differently. Miller foreclosed any potential liability for increased interest in his cases by making payments prior to December 31, 1984; no interest accrued after that date. In contrast, petitioners made no such payment, and they conceded that the increased rate of interest under section 6621(c) applies in their cases. Liability for the increased rate of interest is the principal difference between the settlement in the Miller cases, which petitioners declined when they failed to accept the piggyback agreement offer, and the settlement offer that petitioners also failed to accept.

Petitioners argue that section 6621(c) must have been an issue in the Miller cases since each of the decisions in Miller recites "That there is no increased interest due from the petitioner[s] for the taxable years [at issue] under the provisions of IRC section 6621(c)." According to petitioners, "Surely, if the Millers were not otherwise subject to the penalty interest provisions because of the particular timing of their tax payments, there would have been no need for the Court to include

such a recital in its decisions."  This argument by petitioners is entirely conjectural and is not supported by the documentation on which counsel relies.  In fact, the recital that no increased interest under section 6621(c) was due in the Miller cases was an express term of the settlement documents in those cases and apparently included in the decisions for completeness and accuracy.  There is nothing in the records in the present cases, or in the Court's opinions in Estate of Satin v. Commissioner, T.C. Memo. 1994-435, or Fisher v. Commissioner, T.C. Memo. 1994-434, or in any of the material submitted to us in these cases that would indicate that the Millers were "otherwise subject to the penalty interest provisions".  Petitioners' argument is based on a false premise.

We find that petitioners and Miller were treated equally to the extent they were similarly situated, and differently to the extent they were not.  Miller foreclosed the applicability of the section 6621(c) increased rate of interest in his cases, while petitioners concede it applies in their cases.  Petitioners failed to accept a piggyback settlement offer that would have entitled them to the settlement reached in the Miller cases, and also did not enter into a settlement offer made to them prior to trial of a test case.  In contrast, prior to trial Miller negotiated for himself and accepted an offer that was essentially the same as the Plastics Recycling project settlement offer that

petitioners failed to accept prior to trial.  Accordingly,
petitioners' motions are not supported by the principle of
equality on which they rely.  Cf. <u>Baratelli v. Commissioner</u>, T.C.
Memo. 1994-484.

In order to reflect the foregoing,

<u>An appropriate order will</u>
<u>be issued denying petitioners'</u>
<u>motions, and decisions will be</u>
<u>entered under Rule 155</u>.